IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
October 9, 2009

No. 08-10477

Charles R. Fulbruge III
Clerk

A M, by and through her Parents and Guardians Richard Dale McAllum Jr. and Shelby Voda McAllum; A T, by and through her Parents and Guardians Darrell Ray Thomas and Joni Ann Thomas; M T, by and through her Parents and Guardians Darrell Ray Thomas and Joni Ann Thomas

Plaintiffs - Appellants

v.

PAUL ELLIOTT CASH, in his official capacity as Principal of Burleson High School; BOARD OF TRUSTEES OF BURLESON INDEPENDENT SCHOOL DISTRICT

Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before GARWOOD, DENNIS, and PRADO, Circuit Judges.

DENNIS, Circuit Judge:

Plaintiffs are current and former students of Burleson High School, located in Burleson, Texas. In response to previous incidents, the high school adopted a policy prohibiting the display of the Confederate flag on school grounds. When plaintiffs A.M. and A.T. came to school at the beginning of the spring 2006 semester carrying purses adorned with large images of the Confederate battle flag, administrators required them to cease carrying the purses (giving them the option of leaving the purses in the administrative offices until school ended for

the day, or to have someone come and pick the purses up from the school).  The girls voluntarily went home for the day rather than comply with the demand.  Plaintiffs then brought the instant action, seeking damages and permanent injunctive relief on grounds, *inter alia*, that the policy and its enforcement abridges the right to free speech and expression guaranteed by the First and Fourteenth Amendments of the United States Constitution.  The district court granted summary judgment to defendants, based primarily on its conclusion that the ban is permissible under the Supreme Court's decision in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969).  For the reasons set forth below, we affirm.

## I.  BACKGROUND

The school district's dress code states that "there will be no tolerance for clothing or accessories that ha[ve] inappropriate symbolism, especially that which discriminates against other students based on race, religion, or sex."  Supplementing this district-wide policy, Burleson High School ("BHS") has a policy, enacted during the 2002-2003 academic year, that prohibits the visible display of the Confederate flag on the school's campus.  This policy followed racial strife among students at the school, some of which centered on students' display of the Confederate flag.

At the beginning of the spring semester in January 2006, plaintiffs A.M. and A.T. came to school carrying purses bearing large images of the Confederate battle flag.  That same day, a teacher referred the girls to the administration for discipline pursuant to the policy against visible displays of the Confederate flag.  Administrators, treating the purses like any other dress code violation, gave A.M. and A.T. the options of leaving their purses in the front office until school let out or having someone come to the school to retrieve the purses.  Choosing neither option, the girls chose to go home for the remainder of the day.  A.M. and A.T. were not suspended, and officials took no other disciplinary action against them.

2

The girls subsequently appealed the policy prohibiting displays of the Confederate flag using the school district's internal administrative procedures. The first step, referred to as a "Level I" appeal, was an appeal to defendant BHS principal Paul Elliott Cash. Cash explained the history of the policy, noted the past incidences of racial tension and violence on the campus, detailed *infra*, and concluded that "the number of incidents would be higher but for the restriction on visible displays of the Confederate flag." Cash therefore denied the Level I appeal. A.M. and A.T. then pursued a "Level II" appeal, which was heard by district superintendent Mark Jackson. Jackson agreed with Cash's determination, reasoning that "if I did not enforce the Confederate flag ban, then the number and types of confrontational incidents on campus would increase dramatically, resulting in material interference and substantial disruption of the educational environment." Accordingly, Jackson denied the Level II appeal.

Cash's affidavit and the affidavit of the preceding principal, Mark Crummel, document the history of racial tension and hostility at BHS. This evidence is largely uncontroverted. BHS has approximately 2,300 students. At all relevant times, less than sixty of those students were African-American. Cash reviewed the school's disciplinary records and averred that during the 2002-2003 school year, there were 35 reported incidences of race-related problems. The next year brought one referral based on a student's use of a racial epithet against another student. During the 2004-2005 school year, there were ten referrals involving racial incidents. One of these incidents involved a student who drew a Confederate flag in his notebook accompanied by the statement "No niggers; subject to hanging." Finally, during the 2005-2006 school year (the year in which A.M. and A.T. brought their purses), there were seven race-related referrals. One involved a student who drew a noose and made comments about hanging minorities. Cash noted that these numbers likely do not represent the full extent of race-related incidents as many invariably go unnoticed by administrators and unreported by students. For example, it was

3

apparently common to find racially hostile graffiti in the restrooms, but this rarely resulted in disciplinary referrals because the offending student could not be identified. This racial hostility occasionally resulted in physical confrontations. During the 2002-2003 school year, there was a fight in the lobby area of the gymnasium prior to the start of a basketball game between BHS students and supporters of a predominantly African-American high school. The local police were called and "had to assist in restoring order." This prompted increased police presence at future athletic events.

Also during the 2002-2003 school year, a BHS student "shoved a Confederate Flag in the face of several members" of another high school's all-black girls volleyball team as they walked through the BHS hallways. According to Crummel, this incident caused tension and required Crummel, who was then the principal at BHS, to apologize on behalf of the school. Thereafter, BHS students attempted to display the flag at athletic events, prompting BHS administration and staff to "intervene." The same school year (2002-2003), supporters of a predominantly African-American school left BHS during a sporting event because a BHS student waived the flag from his pick-up truck in front of them. This caused the state high school athletics governing body to view the display of the flag at BHS events as a racial insult and a means of intimidation, and led to the consideration of sanctions against BHS because the school was "identified [as] having a reputation . . . as being openly hostile to African-Americans; if not simply racist." That year, some white BHS students also waved a Confederate flag in the direction of a group of fellow African-American students as they waited for the bus. According to Crummel, the staff viewed this "as an attempt to intimidate our African-American students." Following these incidents, during the 2002-2003 school year, BHS instituted the ban on visible displays of the Confederate flag.[1]

---

[1] Plaintiffs have not offered evidence refuting that these incidents occurred. Rather, they aver only that they did not know about the incidents, and have provided the affidavit of

4

During the 2005-2006 school year, administrators found graffiti in a boys restroom containing racial epithets (which was apparently common) accompanied by a drawing of the Confederate battle flag. On Martin Luther King, Jr. Day in 2006 -- less than a month after A.M. and A.T. carried their purses to school -- a homemade Confederate battle flag was raised on the BHS flagpole and graffiti representing the flag was drawn on the sidewalk below. In December 2006, the following academic year, a white BHS student attempted to wrap his belt around an African-American student's neck while using racial epithets and threatening to hang him. That school year also saw three disciplinary referrals of students who used racial epithets.

A.M. has averred that her purse did not cause a disruption and that she had never heard of the 2002 incident involving the display of the flag in front of an opposing team. A.M. also states that she has seen numerous violations of the dress code, including sexually crude t-shirts, clothing promoting drug and alcohol use, and clothing identifiable with a particular ethnic or social group (e.g., Mexican flag t-shirts, t-shirts with Malcolm X, or rainbow belts) that she claims violates the dress code yet did not result in discipline against the students. As to her purse, A.M. asserts that her ancestors fought in the Civil War and that the "flag is a venerated symbol of my ancestry, a symbol of my Christian religious faith, and a symbol of the South, a symbol of American history and a political symbol, to me, of limited government and resistance to unconstitutional authority." She further claims that there has not been a "single fight related to the racial abuse," and states that "[m]ore importantly none of this stuff is related to our purses or even to the Confederate flag."

Like A.M., A.T. states that she is "upset that [BHS] has tried to link the harmless carrying of my Confederate purse with racial intimidation and

_____

a school security guard who stated that, although he had no personal knowledge of the volleyball incident, there was no recollection of the event among students and faculty members.

violation of the rights of other students" and that the flag for her represents a symbol of patriotism, faith, and family. A.T. has also noticed a lack of enforcement of the dress code and specifically mentions displays of the Mexican flag, the Canadian flag, Malcolm X, a male student who wears female makeup and clothing, and sexually offensive t-shirts. She claims she had no connection to the Martin Luther King, Jr. Day incident and the graffiti in the bathroom. According to her, "Many students support my right to carry my purse, even students who don't care much for the Confederate flag."

Plaintiffs filed the instant action in the United States District Court for the Northern District of Texas on February 9, 2007. Their amended verified complaint asserts five claims under federal and state law. Under 42 U.S.C. § 1983, plaintiffs allege: (1) that the ban on Confederate symbols as enforced against plaintiffs abridged their rights under the First and Fourteenth Amendments to freedom of speech and expression; (2) that the school's dress code violates their due process rights under the Fourteenth Amendment because it is vague and overbroad; (3) that defendants have deprived plaintiffs of the equal protection of the laws guaranteed by the Fourteenth Amendment by enforcing the dress code against them "while allowing other students to wear attire with politically, racially and ethnically provocative symbols"; and (4) that plaintiffs' ability to display pride in their heritage is a protected right under the Ninth Amendment and has been infringed by defendants' actions.[2] Under Texas law, plaintiffs assert that defendants have violated the free speech protections of the Texas Constitution.[3] Plaintiffs prayed for relief in the form of a judgment declaring defendants have violated their constitutional rights, an order that their student records be expunged, an award of damages and costs, and the

---

[2] The district court granted defendants' motion to dismiss this claim pursuant to Rule 12(b)(6). Plaintiffs do not appeal that decision.

[3] Although the district court granted summary judgment to defendants on this state-law claim, plaintiffs have not appealed this ruling.

issuance of a permanent injunction prohibiting defendants from further violating these rights.

Thereafter, plaintiffs moved for a preliminary injunction prohibiting the continued enforcement of the ban on displays of the Confederate flag at BHS. The district court denied the motion, concluding that plaintiffs failed to show a likelihood of success on the merits. Analyzing defendants' actions under the standard established in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), the district court found that defendants reasonably concluded that the prohibited speech (i.e., visible displays of the Confederate battle flag) was imposed to prevent an anticipated substantial and material disruption of the educational process at BHS. Specifically, the district court noted that defendants could reach this decision based on the historical atmosphere of racial hostility at BHS as well as the problems caused by displaying the Confederate battle flag in the past. Plaintiffs argued that the *Tinker* standard was not met because there is no evidence that the Confederate battle flag itself caused disruptions of the degree required to show that their display would cause disruption. The district court found this argument unpersuasive, reasoning that the prior incidents and the flag's dual meaning were sufficient to meet the *Tinker* standard. As to plaintiffs' due process and equal protection claims, the district court found that plaintiffs would not be able to show that the policy was so vague as to violate due process and otherwise found that these claims simply reiterated their meritless First Amendment arguments.

Defendants moved for summary judgment on all of plaintiffs' claims. Relying heavily on the reasons stated in its order denying preliminary injunctive

7

relief, the district court granted summary judgment to defendants.[4]  Plaintiffs timely appealed.

## II.  STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment *de novo*, applying the same standard as the district court.  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).  A party is entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *See Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 325 (5th Cir. 2004).  In reviewing the evidence, the court must therefore "refrain from making credibility determinations or weighing the evidence."  *Turner*, 476 F.3d at 343.

## III.  DISCUSSION

### A.    Free Speech and Expression

It is axiomatic that students do not "shed their constitutional rights to freedom or speech or expression at the schoolhouse gate."  *Tinker*, 393 U.S. at 504.  Despite this well-established principle, school officials nonetheless retain some "authority, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."  *Id*.  Recognizing the tension between these interests, the Supreme Court in *Tinker* held that school officials may prohibit student speech and expression upon showing "facts which might reasonably have led school authorities to forecast [that the proscribed speech would cause] substantial disruption of or material interference with school

---

[4] The district court's order granting summary judgment also addressed evidentiary and discovery-related motions made by the plaintiffs (the court denied the motions).  Plaintiffs do not contest these rulings on appeal.

activities." *Id.* at 514. School officials "must be able to show that [their] action[s] [were] caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 508.

*Tinker* involved a group of students who planned to wear armbands at school as a means of protesting the Vietnam War. Learning of the plan in advance, the school district adopted a policy of suspending students who, upon request of administrators, refused to remove their armbands. The plaintiff-students were suspended when they wore their armbands and refused to comply with a request to remove them. Applying the above standard to the facts of the case, the Supreme Court held that the school district failed to meet its burden because "the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of armbands would substantially interfere with the work of the school or impinge upon the rights of other students." *Id.* at 509. The school district offered no evidence to prove that its policy was motivated by a desire to avoid the type of material disruption that would support a ban on speech: "Clearly the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Id.* at 510.

This court has further elaborated on *Tinker*'s material disruption standard. Although school officials may prohibit speech based on a forecast that the prohibited speech will lead to a material disruption, the proscription cannot be based on the officials' mere expectation that the speech will cause such a disruption. Officials must base their decisions "on fact, not intuition, that the expected disruption would probably result from the exercise of the constitutional right and that foregoing such exercise would tend to make the expected disruption substantially less probable or less severe." *Butts v. Dallas Indep. Sch. Dist.*, 436 F.2d 728, 731 (5th Cir. 1971); *see also id.* at 732 ("[T]here must be

some inquiry, and establishment of substantial fact, to buttress the determination."); *Shanley v. Northeast Indep. Sch. Dist.*, 462 F.2d 960, 970 (5th Cir. 1972) ("[T]he board cannot rely on *ipse dixit* to demonstrate the 'material and substantial' interference with school discipline."). While school officials must offer facts to support their proscription of student speech, this is *not* a "difficult burden," *Shanley*, 462 F.2d at 970, and "their decisions will govern" if they are "within the range where reasonable minds will differ," *Butts*, 436 F.2d at 732.

Applying the *Tinker* standard to the instant case, defendants reasonably anticipated that visible displays of the Confederate flag would cause substantial disruption of or material interference with school activities. As an initial matter, plaintiffs agree that some view the Confederate flag in certain circumstances as a symbol of racism and intolerance, regardless of whatever other meanings may be associated with it.[5] There is ample, uncontroverted evidence that elements of the BHS student body have continually manifested racial hostility and tension. This tension has become evident in the various events described above, including racially hostile graffiti and vandalism, multiple disciplinary referrals involving racial epithets, and a physical confrontation between white BHS students and the African-American students of another high school. Some of these events included the use of the Confederate flag, including the incident in which a white BHS student waved the flag in the direction of an opposing school's

---

[5] This concession comports with other courts' views of the meanings associated with the Confederate flag. *See, e.g., Scott v. Sch. Bd. of Alachua County*, 324 F.3d 1246, 1249 (11th Cir. 2003) (observing that the Confederate flag has multiple "emotionally charged" meanings, and is viewed by some as a symbol of white supremacy and racism, even if others view it as a symbol of heritage); *United States v. Blanding*, 250 F.3d 858, 861 (4th Cir. 2001) (per curiam) ("It is the sincerely held view of many Americans, of all races, that the confederate flag is a symbol of racial separation and oppression. And, unfortunately, as uncomfortable as it is to admit, there are still those today who affirm allegiance to the confederate flag precisely because, for them, the flag is identified with racial separation. Because there are citizens who not only continue to hold separatist views, but who revere the confederate flag precisely for its symbolism of those views, it is not an irrational inference that one who displays the confederate flag *may* harbor racial bias against African-Americans.").

predominantly African-American volleyball team. As recently as spring 2006, Confederate flags were flown over the flagpole on Martin Luther King Jr. Day and a white student simulated the lynching of an African-American student. Even if these events do not rise to the level of a "substantial disruption" under *Tinker* (thus justifying the ban based on past actual disruption), they serve as a factual basis for administrators' forecast that disruptions might occur if students were allowed to display racially charged symbols such as the Confederate flag.

Other circuits, applying *Tinker*, have held that administrators may prohibit the display of the Confederate flag in light of racial hostility and tension at their schools. In *Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008), the Sixth Circuit held that a prohibition on clothing bearing the Confederate flag did not violate students' rights in light of "racial tensions" among students, evidenced by racist graffiti, graffiti containing general and specific threats against students, and physical altercations between white and African-American students. *Id.* at 565. Similarly, in *Sypniewski v. Warren Hills Regional Board of Education*, 307 F.3d 243 (3d Cir. 2002), the Third Circuit held that a policy prohibiting students' possession of the Confederate flag was not facially overbroad because "[t]he history of racial difficulties [at the school] provide a substantial basis for legitimately fearing disruptions from the kind of speech prohibited by the policy." *Id.* at 262. This history, as in the instant case, included overt displays of the Confederate flag. *See id.* at 247-48. And the Eleventh Circuit upheld a prohibition on displaying the Confederate flag because there was "evidence of racial tensions existing at the school," as well as "testimony regarding fights which appeared to be racially based." *Scott v. Sch. Bd. of Alachua County*, 324 F.3d 1246, 1249 (11th Cir. 2003).[6]

---

[6] The Eighth and Tenth Circuits have also concluded that prohibitions on the Confederate flag did not infringe on students' rights of free speech and expression, although those cases involved physical altercations directly involving the Confederate flag, among other events demonstrating racial hostility. *See B.W.A. v. Farmington R.-7 Sch. Dist.*, 554 F.3d 734,

11

Plaintiffs nonetheless argue that defendants must do more than offer evidence that racial tension exists at the school. Rather, they contend there must be a direct connection between the prohibited speech and anticipated disruption, shown by evidence that the Confederate flag has actually caused disruptions in the past. Plaintiffs are only partially correct, insofar as *Tinker* does require a connection between the proscribed speech and the expected disruption. Without this connection, there would be no justification for prohibiting the otherwise protected speech. *See Tinker*, 393 U.S. at 508. However, plaintiffs read *Tinker* too narrowly, effectively requiring school officials to wait for the speech to cause disruption before acting. This directly contradicts *Tinker*'s holding that administrators may proscribe speech if there are facts "which might reasonably have led school authorities to *forecast* substantial disruption of or material interference with school activities." *See id.* at 513 (emphasis added); *see also Shanley*, 462 F.2d at 970 ("It is not necessary that the school administration stay a reasonable exercise of restraint 'until disruption actually occur[s].'" (alteration in original) (quoting *Butts*, 436 F.2d at 731)). Here, the racially inflammatory meaning associated with the Confederate flag and the evidence of racial tension at BHS establish that defendants reasonably forecast that the proscribed speech might cause substantial disruption of school activities.

The Sixth and Tenth Circuits have expressly rejected the narrow interpretation of *Tinker* that plaintiffs advance here. The Sixth Circuit noted that the plaintiffs' interpretation "would place 'school officials . . . between the proverbial rock and a hard place: either they allow the disruption to occur, or they are guilty of a constitutional violation.'" *Barr*, 538 F.3d at 565 (alteration in original) (quoting *Lowery v. Everhard*, 497 F.3d 584, 596 (6th Cir. 2001)). Because *Tinker* permits school officials to act based on the potential for

739 (8th Cir. 2009); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1326, 1366 (10th Cir. 2000).

12

disruption, the appropriate "inquiry, then, is whether the school reasonably forecast that the Confederate flag would cause material and substantial disruption to schoolwork and school discipline." *Id.* We also agree with the Tenth Circuit's observation that "'[t]he fact that a full-fledged brawl had not yet broken out over the Confederate flag does not mean that the district was required to sit and wait for one. In this case, the district had a reasonable basis for forecasting disruption from display of such items at school, and its prohibition was therefore permissible.'" *West*, 206 F.3d at 1366-67 (quoting *West v. Derby Unified Sch. Dist.*, 23 F. Supp. 2d 1223, 1233 (D. Kan. 1998)).[7]

Despite these decisions, plaintiffs argue that most courts have required a direct connection between the Confederate flag and past disruptions. In support of this argument, they cite to decisions finding that bans on the Confederate flag do not violate students' First Amendments rights where the flag actually caused past disruptions. *See West*, 206 F.3d at 1362-63 (upholding a school policy prohibiting the wearing or possession of items with the Confederate flag because, in addition to other incidents of racial tension, there were "several verbal confrontations" between groups of students wearing Confederate flag and Malcolm X t-shirts); *Melton v. Young*, 465 F.2d 1332, 1333-34 (6th Cir. 1972) (upholding a school policy prohibiting Confederate flags on campus following community-wide racial disturbances involving the flag); *Phillips v. Anderson County Sch. Dist. Five*, 987 F. Supp. 488, 492-93 (D.S.C. 1997) (upholding the suspension of a student for wearing a jacket bearing the Confederate flag in light of prior incidents "of racial tension directly caused or escalated by the presence of Confederate Flag clothing, . . . as well as incidents of racial disputes"). Contrary to plaintiffs' assertion, however, these cases do not stand for the proposition that schools may not prohibit the display of the Confederate flag unless it has actually caused past disruptions. Rather, they

---

[7] Plaintiffs argue we should instead follow the Sixth Circuit's decision in *Castorina ex rel. Rewt v. Madison County School Board*, 246 F.3d 536 (5th Cir. 2001).

13

reflect the principle that administrators will usually meet their burden under *Tinker* by showing that the proscribed speech has in fact been disruptive in the past. *See Shanley*, 462 F.2d at 970; *see also Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 259 n.7 (4th Cir. 2003). But *Tinker* does not *require* a showing of past disruption; administrators can also meet their burden by establishing that they had a reasonable expectation, grounded in fact, that the proscribed speech would probably result in disruption. *See Butts*, 436 F.2d at 731*; see also Doninger v. Neihoff*, 527 F.3d 41, 51 (2d Cir. 2008); *Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 987 (9th Cir. 2001). While it is possible for administrators to fail to meet this burden in the absence of past disruptions, *see Castorina v. Madison County Sch. Bd.*, 246 F.3d 536, 543-44 (6th Cir. 2001), the racial tension and hostility at the school justified defendants' ban on visible displays of the Confederate flag in this case.

Accordingly, we hold the district court did not err in granting summary judgment to defendants on plaintiffs' free speech and expression claim.

## B.    Due Process

Plaintiffs next argue that the school district's dress code, particularly its use of the term "inappropriate symbolism," is unconstitutionally vague because students do not have adequate notice of what clothing is prohibited. We disagree.

"A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Women's Medical Ctr. of N.W. Houston v. Bell*, 248 F.3d 411, 421 (2001) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). Students may challenge school policies based on their alleged vagueness, but the Supreme Court has held that the standards for determining vagueness apply differently in the school context:

14

We have recognized that 'maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship.' Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions.

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985)).

The student in *Fraser* was given two days' suspension for delivering a sexually explicit speech at a school assembly. *Id.* at 678-79. The school maintained a policy prohibiting "[c]onduct which materially and substantially interferes with the educational process," which expressly included "obscene" speech, and teachers had warned the student prior to his speech that it was "'inappropriate'" and that he might face "'severe consequences'" if he delivered it. *Id.* at 678. The Supreme Court quickly rejected the student's claim that the policy was unconstitutionally vague, finding his argument "wholly without merit." The Court reasoned that the policy and warnings gave him adequate notice that he might be punished for giving the speech, particularly given school officials' discretion to develop school policies and the fact that the student received a relatively light sanction. *Id.* at 686.

Turning to the instant case, defendants could enact policies that permitted enough flexibility to deal with "a wide range of unanticipated conduct," and the policy at issue here was not more vague than the prohibition in *Fraser* against "obscene" speech. Plaintiffs here -- like the student in *Fraser* -- were given a warning that the particular speech at issue would give rise to discipline, via a policy specifically prohibiting visible displays of the Confederate battle flag. Finally, plaintiffs were never suspended; they only voluntarily chose to go home for the day rather than leave their purses in the school's front office or have a parent retrieve them. Just as in *Fraser*, this light sanction militates against

their vagueness claim. Thus, the district court properly granted summary judgment to defendants on this due process claim.[8]

## C.    Equal Protection

Plaintiffs argue that defendants violated their rights to equal protection because they were disciplined under the dress code for their Confederate flag purses while other students who wore clothing with "inappropriate symbolism" were not. The district court granted summary judgment to defendants on this claim because they have not provided evidence that the ban was enforced unequally and because the prohibition on the flag was justified under *Tinker*.

Under the equal protection clause, strict scrutiny applies to classifications that infringe on a fundamental right (such as the right to free speech and expression) or involve a protected classification. *See Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 & n.4 (1976) ("[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class," such as alienage, race, or ancestry). For the reasons stated above, plaintiffs have not shown that the defendants' policy infringed their fundamental rights, nor have plaintiffs alleged that they have been treated differently based on a protected classification.[9]

---

[8] Plaintiffs have also claimed that the dress code violates due process because it is "overbroad," presumably referring to the overbreadth doctrine under the First Amendment as incorporated by the Fourteenth Amendment Due Process Clause. *See Hersh v. United States*, 553 F.3d 743, 762 (5th Cir. 2008). However, plaintiffs have failed to offer any argument as to the policy's alleged overbreadth and have therefore waived this claim. *See United States v. Miranda*, 248 F.3d 434, 444 (5th Cir. 2001).

[9] We note that plaintiffs' equal protection claim largely mirrors their claim that defendants have impermissibly burdened their rights to free speech and expression. "It is generally unnecessary to analyze laws which burden of the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights. Laws which classify persons in their exercise of these rights will have to meet strict tests for constitutionality without need to resort to the equal protection clause. Should the laws survive substantive review under the specific guarantees they are also likely to be upheld under an equal protection analysis . . . ." 4 Rotunda & Nowak, *Treatise on Constitutional Law:*

16

Thus, plaintiffs' rights to equal protection have been violated only if the policy is not "rationally related to a legitimate government purpose." *See City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989); *Lyng v. Int'l Union*, *UAW*, 485 U.S. 360, 370 (1988). The dress code and the ban on visible displays of the Confederate flag undoubtedly satisfy the deferential rational-basis standard, "which is the most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause." *Stanglin*, 490 U.S. at 26. The Supreme Court has "repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker*, 393 U.S. at 507. Thus, there is a legitimate governmental interest in maintaining discipline and order in the public schools. *Cunningham v. Beavers*, 858 F.2d 269, 273 (5th Cir. 1988); *Ingraham v. Wright*, 252 F.2d 909, 916 (5th Cir. 1976) (en banc), *aff'd*, 430 U.S. 651 (1977). Because school officials reasonably anticipated that displays of the Confederate flag would cause substantial disruption of or material interference with school activities, we conclude the policy was rationally related to the legitimate interest in maintaining school discipline and order. Accordingly, the district court did not err in granting summary judgment to defendants on this claim.

## IV. CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court.

*Substance and Procedure* § 18.40, at 389 (4th ed. 2008).

GARWOOD, Circuit Judge, concurring.

I concur, and append these remarks to reflect my understanding of the contours of our holdings herein.

As Judge Dennis well explains, the evidence here adequately shows sufficient incidents of actual disruption at BHS arising from student display of the Confederate flag in the context of racial hostility and tension there. His opinion correctly notes that the challenged policies followed and were in response to incidents of "racial strife among students at the school, some of which centered on students' display of the Confederate flag," such as, for example, when BHS students shoved a Confederate flag in the face of several members of another high school's all black girls' volleyball team as they walked through the BHS hallways. Accordingly, there is no need to opine on whether some generally assumed racially inflammatory meaning associated with the Confederate flag together with evidence of racial tension at BHS would alone suffice to sustain the instant ban on students wearing the flag at the school. Any such ruminations would be essentially *dicta*. Moreover, there is no evidence of actual or reasonably foreseeable disruption from BHS student wearing or display of *other* symbols on clothing identifiable with any particular group or cause. Nor is there any evidence that the school administrators acted out of personal disagreement with or hostility to the ideas that the Confederate flag symbolized to them, or otherwise for reasons *apart* from concern for the danger that student display of the flag at school, in the BHS context, unreasonably risked, as the evidence adequately showed, provoking disruption, including racial physical confrontations, there. I do not read the opinion as subscribing to the questionable idea that governmental actors may restrict display of the Confederate flag on the basis of a general assumption that "some" who display that flag "may" harbor racial bias or belief in racial separation.