**REVISED July 3, 2017**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-40160

United States Court of Appeals
Fif h Circuit

**FILED**

June 30, 2017

Lyle W. Cayce
Clerk

BRENDA BRINSDON,

Plaintiff - Appellant

v.

MCALLEN INDEPENDENT SCHOOL DISTRICT; YVETTE CAVAZOS, Individually and in her official capacity as a teacher in the McAllen Independent School District; REYNA SANTOS, Individually and in her official capacity as a teacher in the McAllen Independent School District,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

ON PETITION FOR REHEARING EN BANC

Before DAVIS, PRADO, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

No judge in active service on this court requested that the court be polled in response to the petition for rehearing en banc. The petition is denied. The panel's prior opinion is withdrawn, and this opinion is substituted.

When Brenda Brinsdon was a sophomore at a high school in McAllen, Texas, she was required to participate in what defendants claim was a mock

No. 15-40160

performance of the Mexican Pledge of Allegiance as an assignment for her Spanish class. She refused. Brinsdon later filed suit, alleging the defendants violated her constitutional rights. The district court entered summary judgment for the defendants on some of Brinsdon's claims. After a trial on the remaining claims, the district court entered judgment as a matter of law for the defendants. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

McAllen is a municipality whose limits extend to Texas's border with Mexico.[1] It has a population of 138,000.[2] McAllen is also part of the McAllen-Edinburg-Mission Statistical Area, which has the country's second highest percentage of Hispanic people — almost 91% of its population of 775,000.[3]

Monday, September 12, 2011, began the first week of classes at McAllen Achieve Early College High School, a public school in the McAllen Independent School District (the "District"). At the time, Brenda Brinsdon was a sophomore at the high school. One of the classes Brinsdon took was Spanish III, which was taught by Reyna Santos. Santos also taught four other Spanish classes.

On that Monday, Santos distributed an assignment to all her classes. It required students to memorize and recite in Spanish the Mexican Pledge of Allegiance[4] and sing the Mexican National Anthem by that Friday, September

---

[1] MAPTECHNICA, https://www.maptechnica.com/us-city-boundary-map/city/McAllen/state/TX/cityid/4845384 (last visited June 30, 2017).

[2] TEXAS ALMANAC 2016–2017, at 436 (2016).

[3] STEVEN G. WILSON, ET AL., U.S. CENSUS BUREAU, PATTERNS OF METROPOLITAN AND MICROPOLITAN POPULATION CHANGE: 2000 TO 2010, at 50 (2012), www.census.gov/prod/cen2010/reports/c2010sr-01.pdf.

[4] An English translation of the pledge is this: "Mexican Flag, legacy from our heroes, symbol of the unity of our ancestors and our brothers, we promise you to always be loyal to the principles of freedom and justice that make this an independent, human and generous nation to which we dedicate our existence."

No. 15-40160

16.   The assignment was a part of a week-long celebration of Mexican Independence Day, which is on September 16. According to the class syllabus, the assignment was meant to make students aware of "the culture and heritage of a neighboring country . . . ." Santos testified that the exercise was meant for cultural awareness and language fluency. Students were to mimic the pledge ceremony that Mexican citizens follow: saying the words while standing with their right arms raised at a 90-degree angle.

Brinsdon's brief states she is proud to be of mixed American and Mexican heritage, as her mother was born in Mexico and her father in the United States. Brinsdon still objected to the assignment, believing "pledging her allegiance to a different country was wrong . . . ." She did not complain about having to sing the Mexican National Anthem. She informed Santos she would not recite the pledge. Additionally, Brinsdon wanted the entire class to be exempt from the assignment. Santos replied that the assignment was graded and mandatory. Brinsdon left class to see Principal Yvette Cavazos. What happened during and immediately after Brinsdon's meeting with Cavazos is in dispute.

Brinsdon testified that Cavazos failed to address her concerns, instead justifying the assignment simply as "a cultural thing." Brinsdon then claims she returned to the classroom and saw that her class was practicing the pledge. She stated that she felt peer pressure, knew the eventual assignment was graded, and decided to practice reciting the pledge. After class, Brinsdon again met with Cavazos, this time with Santos present. The three agreed that Brinsdon would submit a writing assignment to Santos in lieu of reciting the pledge. Cavazos, on the other hand, testified she accompanied Brinsdon from her office to Santos's class and met with Santos at that time to discuss an alternative assignment.

It is undisputed, however, that Brinsdon was given an alternative assignment on which she received a "C." Most of the other students received

an "A." It is unclear whether the grade Brinsdon received was due to her lack of effort, as Santos asserted, retaliation for having complained about reciting the pledge, as Brinsdon suspected, or another reason.

After the end of school on Monday, Brenda Brinsdon informed her father, William Brinsdon, of these events. At her father's insistence, later that week Brenda took to class her father's "spy pen," *i.e.*, a small camera and audio recorder disguised to look like a regular pen. Their goal was to acquire a secret recording of her classmates reciting the Mexican pledge. Brenda did not have permission to record the class. Neither Santos nor Brenda's classmates knew they were being recorded. Also that week, on Thursday, September 15, 2011, William Brinsdon met with Principal Cavazos. The meeting did not alleviate his concerns. Other school authorities allegedly were unresponsive.

Though the dates are unclear, William Brinsdon e-mailed the spy-pen video to a media source, *The Blaze*. It then placed the video on YouTube. On October 17, 2011, Mr. Brinsdon told the principal he had contacted some media outlets, and he would be interviewed by national radio host Glenn Beck that day. During their meeting, Principal Cavazos informed him of the "numerous calls and threatening emails" the school had received regarding the video. On the same day as the interview, the spy-pen recording was published on Beck's news website, *The Blaze*. The next day, *Fox News* interviewed Brenda Brinsdon. These interviews apparently intensified the national publicity that was given to the Brinsdons' complaints about the pledge assignment.

After this media attention, officials at the high school say they were inundated with calls, letters, and emails. A substantial number of these communications were derogatory toward Hispanics. Some threatened harm to individuals at the school. In addition, there was testimony about Brinsdon's disrespectful behavior towards her teacher Santos, increased tension among her classmates, and other effects of the video's release.

No. 15-40160

On October 19, 2011, the day after *Fox News* interviewed Brenda Brinsdon, two days after William Brinsdon's interview with Glenn Beck and *The Blaze*'s publication of the recording, and over a month after Brenda says she was compelled to recite the Mexican pledge, Brenda was removed from class. Brenda completed Spanish III by self-studying in Cavazos's office. She graduated from this high school in 2014.

Brenda Brinsdon, through her father, filed suit on February 27, 2013. She sought an injunction, a declaratory judgment, and nominal damages against Santos, Cavazos, and the District. Brinsdon asserted her claims under 42 U.S.C. § 1983. Brinsdon's first claim was that her First Amendment rights were violated when she was compelled to recite the pledge and that she was retaliated against when she was removed from class. Brinsdon's second claim was based on the Equal Protection Clause, arguing that she suffered disparate treatment when she was removed from class. Cavazos and Santos, the two individual defendants, asserted qualified immunity as a defense.

All parties filed motions for summary judgment. The district court denied Brinsdon's motion in full. It entered summary judgment in part for the individual defendants, upholding their qualified-immunity defense. The court also granted summary judgment for the District for removing Brinsdon from class. The compelled-speech and equal-protection claims against the District proceeded to trial. The district court entered judgment as a matter of law in favor of the District, concluding Brinsdon had not established a municipal policy. Brinsdon timely appealed.

## DISCUSSION

Among Brinsdon's claims of error is that the district court should have granted her motion for summary judgment on the equal-protection and compelled-speech claim. Denials of summary judgment, with few exceptions

not relevant here, are not final decisions that can be reviewed. *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc). Hence, Brinsdon cannot appeal this aspect of the district court's order.

Accordingly, we review only these issues and rulings:

I.  Possible mootness of the case due to Brinsdon's graduation;

II. The entry of judgment as a matter of law on the issue of the District's municipal liability, after Brinsdon had presented her case at trial;

III. The entry of summary judgment in favor of Cavazos and Santos on qualified immunity;

IV. The entry of summary judgment for all defendants on the claim that she was improperly removed from class. We consider the validity of this ruling as to the District when discussing municipal liability and as to the individual defendants under the last issue.

*I.    Mootness*

A claim is moot when a case or controversy no longer exists between the parties. *Bd. of Sch. Comm'rs v. Jacobs*, 420 U.S. 128, 129 (1975). "Mootness is a jurisdictional matter which can be raised for the first time on appeal." *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 204 (5th Cir. 2010). The mootness doctrine applies to equitable relief but will not bar any claim for damages, including nominal damages. *See Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 748 n.32 (5th Cir. 2009) (collecting cases).

Because Brinsdon has graduated from high school, her equitable claims are moot. *See, e.g., Sapp v. Renfroe*, 511 F.2d 172, 175 (5th Cir. 1975). Additionally, Brinsdon does not qualify for the "capable of repetition, yet evading review" exception because there is no "reasonable expectation that [she] . . . would be subject[] to the same action again." *Lopez v. City of Houston*, 617 F.3d 336, 340 (5th Cir. 2010).

No. 15-40160

Brinsdon relies on two cases to save her equitable claims. In one, the Seventh Circuit held that a permanent injunction in favor of all students in a high school meant that graduated students' claims against the school were not moot. *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011). The case is readily distinguishable. The district court there entered the permanent injunction before one of the named students had graduated. *Id.* at 878. The injunction also expanded the class of plaintiffs to every student at the school. *Id.* at 878–79. These facts kept the case and controversy alive between the plaintiffs-students and the defendant-school district. *Id.* at 879. No such injunction exists as to the high school.

In the other case, the Supreme Court resolved student-speech claims long after the student, Frederick, had graduated. *Morse v. Frederick*, 551 U.S. 393, 397, 409–10 (2007). Frederick sought equitable relief and damages. *Id.* at 399. The Court, though, "granted certiorari on two questions: whether Frederick had a First Amendment right to wield his banner, and, if so, whether that right was so clearly established that the principal may be held liable for damages." *Id.* at 400. The Court had narrowed the relief sought only to damages, which, as we just explained, is not barred by the mootness doctrine.

Because Brinsdon has graduated from high school, her only surviving claim is for nominal damages arising from the alleged violation of her rights.

II. *Municipal Liability*

Brinsdon appeals the district court's entry of judgment as a matter of law in favor of the District on the ground that there was no municipal liability. The motion was made and granted after Brinsdon had presented her case at trial. A judgment as a matter of law is reviewed *de novo*. *Resolution Tr. Corp. v. Cramer*, 6 F.3d 1102, 1109 (5th Cir. 1993). We must view the evidence "in the light and with all reasonable inferences most favorable to the party

opposed to the motion." *Barnett v. I.R.S.*, 988 F.2d 1449, 1453 (5th Cir. 1993).

"[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Additionally, "[t]he policymaker must have either actual or constructive knowledge of the alleged policy" to be held liable. *Cox v. City of Dallas*, 430 F.3d 734, 748–49 (5th Cir. 2005).

Regarding knowledge, the Texas Essential Knowledge and Skills ("TEKS") guidelines give schools parameters and objectives for their lesson plans, but teachers have the flexibility to elect the form or the activities that they use to address those objectives. *See* 19 TEX. ADMIN. CODE ANN. §§ 128.10–.32. Brinsdon argues that Cavazos's authority under the TEKS guidelines to "oversee the curriculum and approve lesson plans" was a delegation of policymaking authority from the District. Therefore, because Cavazos had actual knowledge of the assignment, Cavazos's knowledge can be imputed to the District. Even so, an instructor's "discretion" to review and approve lesson plans is not a delegation. *See Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 216–17 (5th Cir. 1998). Because there was no delegation of policymaking authority to Cavazos, her knowledge of the pledge assignment cannot be imputed to the District.

Brinsdon also makes a constructive-knowledge argument, noting the assignment has been in existence at least since Cavazos's own children performed the assignment when they attended high schools in the District approximately 15 years ago. This evidence, though, at most shows that Cavazos knew the assignment had been given over a decade earlier. The evidence does not establish the assignment's continuity even by the teacher(s) who gave it to Cavazos's children, much less that it was a District policy of any kind that would have affected some or all teachers and schools. While

"prolonged public discussion or . . . a high degree of publicity" would support a finding of constructive knowledge, such facts do not exist here. *See Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002).

Even if we were to accept that the possible longevity of the assignment meant some policymakers in the District were aware of the assignment, this does not prove there was a policy forcing the recitation of the Mexican pledge. The District's alleged knowledge of, and failure to object to, the giving of the assignment is not the same as the District's requiring recitation of the pledge. Again, municipal liability requires "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski*, 237 F.3d at 578. Because there is no official policy, there can be no liability. Though policy may be shown by custom, custom requires "persistent, often repeated, [and] constant violations . . . ." *Id.* at 581. No constant violations have been shown. Partly, that is the result of there being no evidence of anyone previously complaining about the assignment. Such prior complaints potentially would have created evidence of the knowledge of policymakers and whether they insisted upon the recitation of the pledge.

Brinsdon has failed to demonstrate the existence of an official policy or that the District had knowledge of the assignment. Judgment as a matter of law was proper for the District on municipal liability for any constitutional violation that may have arisen from the assignment or subsequent actions. Thus, our ruling also applies to the claims against the District for retaliation and violation of equal protection.

## III.   *Qualified Immunity*

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc).

A "plaintiff has the burden to negate the assertion of qualified immunity once properly raised." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009). To establish that qualified immunity does not apply, Brinsdon must prove that Santos or Cavazos (1) "violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *See Swanson*, 659 F.3d at 371. "A right is clearly established only if its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Wyatt v. Fletcher*, 718 F.3d 496, 502 (5th Cir. 2013) (quoting *Wooley v. City of Baton Rouge*, 211 F.3d 913, 919 (5th Cir. 2000)). Another articulation particularly for the school setting is that educators are entitled to qualified immunity unless no "reasonable official" would have deemed the disputed conduct constitutional. *Swanson*, 659 F.3d at 371. We may begin by analyzing either step of the qualified-immunity inquiry. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Brinsdon makes these claims against Santos and Cavazos: (1) her First Amendment right to be free from compelled speech was violated; (2) she suffered retaliation based on her First Amendment protected speech when she was removed from her class; and (3) she was treated unequally in violation of the Equal Protection Clause. We will discuss the first two claims later. As to the third, we do not separately discuss it inasmuch as the equal-protection argument and the First Amendment retaliation argument mirror each other.[5] That is "because the substantive guarantees of the [First] Amendment serve as the strongest protection against the limitation of these rights. . . . [If the defendants' actions] survive substantive review under the specific guarantees

---

[5] We find no explicit ruling on the equal-protection claim against the individual defendants. The district court, though, in its combined rulings on summary judgment and granting judgment as a matter of law after Brinsdon presented her case at trial, denied all claims. Analytically, the court's rejection of the First Amendment claims was effectively a rejection of the equal-protection claim. With that rejection we concur.

[of the First Amendment,] they are also likely to be upheld under an equal protection analysis . . . ." *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 226 n.9 (5th Cir. 2009). As we will discuss later, we uphold the grant of qualified immunity on Brinsdon's two First Amendment arguments. Consequently, we extend that holding to the equal-protection claim.

On the compelled-speech claim, the district court granted summary judgment to Santos and Cavazos under step two of the qualified-immunity inquiry, meaning that no clearly established right was violated. As to retaliation, summary judgment was granted to those defendants because the only evidence was that Brinsdon was removed not due to her exercise of First Amendment rights but because her actions disrupted class.

We review a grant of summary judgment *de novo*. *LeMaire v. Louisiana Dep't of Transp. & Dev.*, 480 F.3d 383, 386 (5th Cir. 2007). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We now examine the extant claims.

### A.    Compelled Speech

The "right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Indeed, the right to speak and the right not to speak "are complementary components of the broader concept of 'individual freedom of mind'"; any "difference [between them] is without constitutional significance . . . ." *Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796–97 (1988). Brinsdon argues that Santos, an instrument of the state, unconstitutionally compelled Brinsdon to speak against her will.

The most factually analogous precedent to this case is a 1943 Supreme

Court decision that struck down a state statute requiring every schoolchild to salute the American flag and recite the Pledge of Allegiance to the United States. *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The *Barnette* requirement of a pledge began with a 1941 West Virginia statute that required each school to conduct courses in history, civics, and the Constitution "for the purpose of teaching, fostering and perpetuating the ideals, principles and spirit of Americanism . . . ." *Id.* at 625. In early 1942, only a month after the attack on Pearl Harbor and the start of the American involvement in World War II, the West Virginia State Board of Education implemented the statute in part by requiring all teachers and pupils to recite daily the Pledge of Allegiance to the United States. *Id.* at 626. Clearly, West Virginia sought to have students each day make an *operative* pledge of allegiance, that is, a statement of actual belief.

The three-judge district court, through Fourth Circuit Judge John J. Parker, wrote dramatically of the reason the mandatory pledge had to fall:

> The salute to the flag is an expression of the homage of the soul. To force it upon one who has conscientious scruples against giving it, is petty tyranny unworthy of the spirit of this Republic and forbidden, we think, by the fundamental law.

*Barnette v. West Virginia State Bd. of Educ.*, 47 F. Supp. 251, 255 (S.D. W. Va. 1942). The Supreme Court affirmed.[6] *Barnette*, 319 U.S. at 642. It held that the state unacceptably sought to compel "a belief and an attitude of mind." *Id.* at 633. The pledge in *Barnette* was not just a tool to shape learning. It also was a tool to compel patriotism, and this latter goal was unacceptable. The statutory penalties for noncompliance were expulsion from school, fines, and

---

[6] Judge Parker had almost made it to the Supreme Court before *Barnette* did, as he was nominated in 1930 for the Court but failed confirmation by a 39-41 Senate vote. J. MYRON JACOBSTEIN & ROY M. MERSKY, THE REJECTED 111–22 (1993).

even jail. *Id.* at 629. Further, the Court noted that objections to being required orally and in writing to accept an idea were "well known to the framers of the Bill of Rights," and it attempted to assuage fears that "patriotism will not flourish if patriotic ceremonies are voluntary and spontaneous instead of a compulsory routine . . . ." *Id.* at 633, 641.

In a later case, the Court struck down a New Hampshire law that required all vehicle license plates to display the motto "Live Free or Die." *See Wooley*, 430 U.S. at 707, 717. The Court stated that "as in *Barnette*, we are faced with a state measure which forces an individual . . . to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Id.* at 715. Thus, what the Court found objectionable in both *Barnette* and *Wooley* was the state's purpose of "fostering public adherence to an ideological point of view . . . ." *Id.*

The difference with this pledge assignment, the defendants insist, is that Santos was not seeking to inculcate beliefs by requiring the recital of the Mexican pledge. If there were such evidence in this case, we would reach the same result the Supreme Court did in *Barnette* and *Wooley*. There is, though, no direct evidence here of a purpose to foster Mexican nationalism. Instead, the only evidence is that students were, as part of a cultural and educational exercise, to recite a pledge of loyalty to a foreign flag and country. Santos testified and the class syllabus stated that the pledge was educational, and the punishment for noncompliance was a failing grade. It is true that direct evidence of motive or intent can be hard to come by. Here, though, only speculation might support that either defendant was trying to motivate the students to become loyal to Mexico. While the party opposing summary judgment is "entitled to have reasonable inferences drawn in [its] favor, the inferences to be drawn must be rational and reasonable, not idle, speculative, or conjectural." *Unida v. Levi Strauss & Co.*, 986 F.2d 970, 980 (5th Cir. 1993).

We also note that the assignment was a singular event; it was not repeated on a daily basis. In summary, the compelled speech at issue is a pledge for which there is no evidence that its purpose was to compel the speaker's affirmative belief.

Our specific question is whether a student who objects to a pledge of simulated beliefs has a constitutional right to refuse to so pledge. The fact that the pledge did not compel a belief does not strip this assignment from heightened concerns. Requiring a student not just to voice but to simulate the rituals of a pledge of allegiance is serious business. A pledge, whether of allegiance to a country or to tell the truth in a court of law, can express an intention to carry forth a course of action that may impact matters of public concern. Yet, whatever the proper analysis of compelled recitation of simulated pledges may be, no caselaw holds that such analysis is the same as *Barnette.* Indeed, no caselaw has directly addressed this situation.

First, *Barnette* referenced but did not analyze the idea of making a pledge without actually believing in the words uttered. The Court interpreted the Board of Education regulation as being premised on an

> affirmation of a belief and an attitude of mind. It is not clear whether the regulation contemplates that pupils forego any contrary convictions of their own and become unwilling converts . . . or whether it will be acceptable if they simulate assent by words without belief and by a gesture barren of meaning.

*Barnette*, 319 U.S. at 633. Despite that language, the Court was clear that it was invalidating the requirement because the State cannot "force citizens to confess by word or act their faith" in the same orthodoxy of "politics, nationalism, religion, or other matters of opinion . . . ." *Id.* at 642. There is no evidence that the pledge in Spanish class was seeking to force orthodoxy.

Second, other circuits have confronted situations dealing with compelled student speech, though none are directly applicable to this case. The Seventh

Circuit noted it is proper to "deny students the ability to express themselves by adopting the words of others," *i.e.*, commit plagiarism. *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1302 (7th Cir. 1993). The Ninth Circuit discussed that a teacher may, without fear of personal liability, "assign students to write 'opinions' showing how Justices Ginsburg and Scalia would analyze a particular Fourth Amendment question." *Brown v. Li*, 308 F.3d 939, 953 (9th Cir. 2002). Finally, the Tenth Circuit held that a university does not offend the First Amendment when it compels, for legitimate pedagogical reasons, a student to recite lines of a play even if the student believes the recitation would be contrary to her religious convictions. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1291–92 (10th Cir. 2004). In sum, it is clearly established that a school may compel some speech. Otherwise, a student who refuses to respond in class or do homework would not suffer any consequences. Students, moreover, generally do not have a right to reject curricular choices as these decisions are left to the sound discretion of instructors.

Third, it is well understood that "[s]peech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). Thus, even a non-operative pledge may affect the public and political discourse. Nonetheless, First Amendment protections have traditionally been for "matters of adult public discourse," and it is not true that "the same latitude must be permitted to children in a public school." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). The First Amendment rights of students "are not automatically coextensive with the rights of adults in other settings." *Id*. Students must be afforded freedom of speech in school, but the right is "applied in light of the special characteristics of the school environment . . . ." *Tinker v.*

No. 15-40160

*Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

As true of us all, teachers and administrators can exercise their discretion poorly. This case involved a student's disagreement with a teacher's curricular choices and First Amendment issues arising from how the disagreement was addressed. We conclude that Santos as teacher, and Cavazos as principal, were not ignoring clearly established law when compelling a non-operative recitation of the Mexican pledge. Qualified immunity on compelled speech was properly granted.

### B.    *Removing Brinsdon from Class*

Brinsdon claims that Santos and Cavazos violated her First Amendment rights when they retaliated against her by removing her from class. The district court resolved this issue on two bases. Quoting *Tinker*, the court first determined that her removal complied with existing law because her objection to the other students' reciting the pledge and video recording of her classmates constituted "interference . . . with the schools' work or . . . collision with the rights of other students[.]" *See Tinker*, 393 U.S. at 508. Second, the district court held that Santos and Cavazos were entitled to qualified immunity because how existing law applied to the facts was not clearly established.

We first identify what must be shown on a First Amendment retaliation claim. The plaintiffs must prove:

> (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct.

*Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

Some of Brinsdon's briefing indicates she was removed twice from class, once at the time of the original assignment of the pledge, and then again for

16

the rest of the semester in mid-October. The latter is clearly supported by the record, the first much less clearly.

Brinsdon claims her September objection to the assignment to recite the pledge was one cause for her removal from class. In her deposition, Brinsdon stated she was removed from class soon after her October 18 appearance on a *Fox News* broadcast. Though she certainly is bound by her answer, there is evidence she may also have been removed at an earlier time. Brinsdon's opening brief on appeal claims she was removed from her Spanish class for the entire semester shortly after she voiced her objections to performing the pledge, though her deposition does not seem to say that.

If Brinsdon were removed in September, nothing indicates how long she was kept from class at that time. There is an October 19 letter from Santos to Cavazos asking for Brinsdon to be removed for the rest of the semester, at least implying that any earlier banishment had ended. Perhaps Brinsdon's interruptions of her classmates caused her to be kept from class only until the pledge assignment was completed.

We have already discussed why Brinsdon's refusal in September to perform the Mexican pledge in the context presented in this case was not the exercise of a clearly established constitutional right. Thus, however long a removal from class in September may have been, any removal at that time was not retaliation for the exercise of a clearly established constitutional right.

Brinsdon's only personal exercise of a constitutional right in October was her television appearance on *Fox News*. That appearance is far from emphasized in her appellate briefing, which mentions she was interviewed but merges all the controversies as improper bases for her October removal from class. Neither the video nor a transcript of her interview is in the record. No brief even summarizes what Brinsdon said in her five-minute interview. We at least infer that she discussed her views that students at her school should

not be required to recite the Mexican pledge, as that controversy is what made her newsworthy in some quarters.

Brinsdon's appearance on *Fox News* was nearly contemporaneous with her father's interview by Glenn Beck, and Beck's website, *The Blaze,* posting the spy-pen video that Brinsdon secretly made. It is unclear whether the spy-pen video appeared elsewhere online much earlier than mid-October. The defendants have not argued that they may punish Brinsdon for her father's activities.

Finally, as to the facts, Santos sent a letter to Principal Cavazos on October 19, asking for Brinsdon's removal. Santos claimed that Brinsdon's behavior in class had been disruptive and interfered with teaching the other students. Santos called Brinsdon "disrespectful and defiant," and said she demonstrated an "unwillingness to complete assigned coursework" in a proper manner. Brinsdon was removed. The letter, the evidence most contemporaneous to the removal, did not mention national publicity or specific disruptions.

In summary, the controversial October events were the national interviews of both Brinsdons and the posting of the spy-pen video. The evidence, though, is that Brenda Brinsdon was removed from class due to the posting of the spy-pen video. The district court stated: "Defendants emphasize that [Brinsdon's] removal largely centered on her video recording of a fellow student, a violation of school policy."

We find no evidence that Brinsdon's appearance on *Fox News* or her father's interview on *The Blaze* had any effect on campus. No deponent singles out either interview as causing disruptions. The district court stated that the video had "resulted in a disruption of the school and classroom environments." Even if some deponents' broader statements might be seen as including the student's televised interview as one cause of disruption, the undisputed

evidence is that publication of the video was the origin of most of the discord. Making unauthorized and secret video recordings of secondary-school classes does not represent a recognized First Amendment right, nor does the public dissemination of the video. To use *Tinker's* formulation, it was an "invasion of the rights of others[.]" *See Tinker*, 393 U.S. at 513. No clearly established law would have counseled these defendants not to respond to such behavior.

To summarize, the evidence is that disruptions in mid-October were triggered primarily by dissemination of the secret video that showed students, with their faces blurred, performing the Mexican pledge. School officials did not violate clearly established law when the school reacted to the secretly taken video, and the evidence is that is what the officials did.

We agree with the district court that Brinsdon's First Amendment rights were not violated by school officials reacting to the disruptions that had occurred and might continue. Qualified immunity was properly granted to Santos and Cavazos on the claim they violated Brinsdon's First Amendment rights by removing her from class.

AFFIRMED.