In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 10-2485, 10-3635

HEIDI ZAMECNIK and ALEXANDER NUXOLL,

*Plaintiffs-Appellees,*

*v.*

INDIAN PRAIRIE SCHOOL DISTRICT # 204, *et al.*,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 1586—**William T. Hart**, *Judge.*

ARGUED JANUARY 19, 2011—DECIDED MARCH 1, 2011

Before POSNER, KANNE, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* These consolidated appeals (functionally one appeal, and we'll treat them as such) are a sequel to an appeal we decided almost three years ago, *Nuxoll v. Indian Prairie School Dist. # 204*, 523 F.3d 668 (7th Cir. 2008). The plaintiffs, two students at Neuqua Valley High School, a large public high school in Naperville, Illinois, had sued the school district (and school officials, whom we can ignore—we'll call the

defendants, collectively, "the school") for infringing their right of free speech by forbidding them to make a specific negative statement about homosexuality. They moved for a preliminary injunction, which the district judge denied. They appealed, and we reversed, directing the district judge to enter forthwith a preliminary injunction that would permit plaintiff Nuxoll (Zamecnik having graduated) to wear during school hours a T-shirt that recites "Be Happy, Not Gay." Nuxoll's right to wear it outside of school is not questioned.

A private group called the Gay, Lesbian, and Straight Education Network promotes an annual event called the Day of Silence that is intended to draw critical attention to harassment of homosexuals; the idea behind the name is that homosexuals are silenced by harassment and other discrimination. Students participate in the Day of Silence by remaining silent throughout the day except when called upon in class, though some teachers, as part of their own observance of the Day of Silence, will not call on students that day. Some students and faculty wear T-shirts on the Day of Silence that display slogans such as "Be Who You Are." None of the slogans criticizes heterosexuality or advocates homosexuality, though "Be Who You Are" carries the suggestion that persons who are homosexual should not be ashamed of the fact or try to change it.

The plaintiffs, who disapprove of homosexuality on religious grounds, participated (we use the past tense because both have now graduated) with other like-minded students in a Day of Truth held on the first school

day after the Day of Silence. Plaintiff Zamecnik wore a shirt that read "*My* Day of Silence, Straight Alliance" on the front and "Be Happy, Not Gay" on the back. A school official inked out the phrase "Not Gay" and has banned display of the slogan as a violation of a school rule forbidding "derogatory comments," spoken or written, "that refer to race, ethnicity, religion, gender, *sexual orientation*, or disability" (emphasis added). He did not object to the slogan on the front of the shirt.

The plaintiffs assert a constitutional right to make negative statements about members of any group provided the statements are not inflammatory—that is, are not "fighting words," which means speech likely to provoke a violent response amounting to a breach of the peace. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572-73 (1942). They concede that they could not inscribe "homosexuals go to Hell" on their T-shirts because those are fighting words, at least in a high-school setting, and so could be prohibited despite the fact that they are speech, disseminating an opinion. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992).

When last this case was here, we expressed (and we repeat our expression of) sympathy (thought excessive by Judge Rovner in her concurring opinion, 523 F.3d at 676-80) for an expansive interpretation of the "fighting words" doctrine when the speech in question is that of students. We noted that the contribution that kids can make to the marketplace of ideas and opinions is modest (Judge Rovner disagreed) and we emphasized (overemphasized, in her view) a school's countervailing

interest in protecting its students from offensive speech by their classmates that would interfere with the learning process—though we added that because 18-year-olds can now vote, high-school students should not be "raised in an intellectual bubble," *American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001), which would be the tendency of forbidding all discussion of public issues by such students during school hours. (Hence the younger the children, the more latitude the school authorities have in limiting expression. *Muller ex rel. Muller v. Jefferson Lighthouse School*, 98 F.3d 1530, 1538-39 (7th Cir. 1996).)

Thus a school that permits advocacy of the rights of homosexual students cannot be allowed to stifle criticism of homosexuality. The school argued (and still argues) that banning "Be Happy, Not Gay" was just a matter of protecting the "rights" of the students against whom derogatory comments are directed. But people in our society do not have a legal right to prevent criticism of their beliefs or even their way of life. *R.A.V. v. City of St. Paul, supra*, 505 U.S. at 394; *Boos v. Barry*, 485 U.S. 312, 321 (1988). Although tolerance of homosexuality has grown, gay marriage remains highly controversial. Today's high school students may soon find themselves, as voters, asked to vote on whether to approve gay marriage, or to vote for candidates who approve of it, or ones who disapprove.

In asking for a preliminary injunction Nuxoll acknowledged that "Be Happy, Not Gay" was one of the "negative comments" about homosexuality that he

thought himself entitled to make. But we said that unlike "homosexuals go to Hell," which he concedes are "fighting words" in the context of a school (and unlike "I will not accept what God has condemned" and "homosexuality is shameful"—terms held, perhaps questionably—unless euphemism is to be the only permitted mode of expressing a controversial opinion—to be fighting words in *Harper v. Poway Unified School District*, 445 F.3d 1166, 1171 (9th Cir. 2006), vacated as moot, 549 U.S. 1262 (2007)), "Be Happy, Not Gay" is not an instance of fighting words. To justify prohibiting their display the school would have to present "facts which might reasonably lead school officials to forecast substantial disruption." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 514 (1969); see *Boucher v. School Board of School District of Greenfield*, 134 F.3d 821, 827-28 (7th Cir. 1998); *Walker-Serrano ex rel. Walker v. Leonard*, *supra*, 325 F.3d 412, 416 (3d Cir. 2003); *LaVine v. Blaine School District*, 257 F.3d 981, 989 (9th Cir. 2001). Such facts might include a decline in students' test scores, an upsurge in truancy, or other symptoms of a sick school—but the school had presented no such facts in response to the motion for a preliminary injunction.

In this factual vacuum, we described "Be Happy, Not Gay" as "only tepidly negative," saying that "derogatory" or "demeaning" seemed too strong a characterization. 523 F.3d at 676. As one would expect in a high school of more than 4,000 students, there had been incidents of harassment of homosexual students. But we thought it speculative that allowing the plaintiff to wear a T-shirt that said "Be Happy, Not Gay" "would have even a

slight tendency to provoke such incidents, or for that matter to poison the educational atmosphere. Speculation that it might is, under the ruling precedents, and on the scanty record compiled thus far in the litigation, too thin a reed on which to hang a prohibition of the exercise of a student's free speech." *Id.*

Not that *Tinker*'s "substantial disruption" test has proved a model of clarity in its application. The cases have tended to rely on judicial intuition rather than on data, and the intuitions are sometimes out of date. For example, although it's been ruled that "lewd, vulgar, obscene, or plainly offensive speech" can be banned from a school, *Canady v. Bossier Parish School Bd.*, 240 F.3d 437, 442 (5th Cir. 2001), the authority for the ruling—*Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 680-82 (1986)—involved student speech that, from the perspective enabled by 25 years of erosion of refinement in the use of language, seems distinctly lacking in shock value (e.g., "I know a man who is firm—he's firm in his pants, he's firm in his shirt, his character is firm—but most . . . of all, his belief in you, the students of Bethel, is firm," *id.* at 687 (concurring opinion)). An example of school censorship that courts have authorized on firmer grounds is forbidding display of the Confederate flag, as in *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 333-36 and n. 6 (6th Cir. 2010); *Scott v. School Board of Alachua County*, 324 F.3d 1246, 1248-49 (11th Cir. 2003) (per curiam), and *West v. Derby Unified School District No. 260*, 206 F.3d 1358, 1361, 1365-66 (10th Cir. 2000)—cases in which serious racial tension had led to outbursts of violence even before the display of the flag,

which is widely regarded as racist and incendiary. *Boroff v. Van Wert City Board of Education*, 220 F.3d 465, 467, 469-71 (6th Cir. 2000), involved T-shirts that depicted a three-faced Jesus, accompanied by the words "See No Truth. Hear No Truth. Speak No Truth" and advocated, albeit obliquely, the use of illegal drugs, a form of advocacy in the school setting that can be prohibited without evidence of disruption. *Morse v. Frederick*, 551 U.S. 393, 406-10 (2007).

These cases, more extreme than ours, do not establish a generalized "hurt feelings" defense to a high school's violation of the First Amendment rights of its students. "A particular form of harassment or intimidation can be regulated . . . only if . . . the speech at issue gives rise to a well-founded fear of disruption or interference with the rights of others." *Sypniewski v. Warren Hills Regional Bd. of Education*, 307 F.3d 243, 264-65 (3d Cir. 2002). The same court, in *Saxe v. State College Area School District*, 240 F.3d 200, 209 (3d Cir. 2001), found "little basis for the District Court's sweeping assertion that 'harassment'—at least when it consists of speech targeted solely on the basis of its expressive content—'has never been considered to be protected activity under the First Amendment.' Such a categorical rule is without precedent in the decisions of the Supreme Court or this Court, and it belies the very real tension between anti-harassment laws and the Constitution's guarantee of freedom of speech." Severe harassment, however, blends insensibly into bullying, intimidation, and provocation, which can cause serious disruption of the decorum and peaceable atmosphere of an institution dedicated to the

education of youth. School authorities are entitled to exercise discretion in determining when student speech crosses the line between hurt feelings and substantial disruption of the educational mission, because they have the relevant knowledge of and responsibility for the consequences.

As Judge Rovner explained in her concurring opinion in the previous appeal, "the statement ['Be Happy, Not Gay'] is clearly intended to derogate homosexuals. Teenagers today often use the word 'gay' as a generic term of disparagement. They might say, 'That sweater is so gay' as a way of insulting the look of the garment. In this way, Nuxoll's statement is really a double-play on words because 'gay' formerly meant 'happy' in common usage, and now 'gay,' in addition to meaning 'homosexual' is also often used as a general insult. Nuxoll's statement easily fits the school's definition of 'disparaging' and would meet that standard for most listeners . . . . [T]here is no doubt that the slogan is disparaging . . . . [But] it is not the kind of speech that would materially and substantially interfere with school activities. I suspect that similar uses of the word 'gay' abound in the halls of [Neuqua Valley High School] and virtually every other high school in the United States without causing any substantial interruption to the educational process." 523 F.3d at 679. Judge Rovner warned that the fact that schools "are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source . . . . The First Amendment . . . is consistent with the school's mission to teach by en-

couraging debate on controversial topics while also allowing the school to limit the debate when it becomes substantially disruptive. Nuxoll's slogan-adorned t-shirt comes nowhere near that standard." *Id.* at 679-80.

The preliminary injunction issued on remand permitted Nuxoll to wear during school hours a T-shirt that recites "Be Happy, Not Gay." Pretrial discovery ensued. Eventually the district judge granted summary judgment in favor of the plaintiffs, awarded each of them $25 in damages for the infringement of their constitutional rights, and later entered a permanent injunction, which differs from the preliminary one in running in favor of any student and in not being limited to the display of the slogan on a T-shirt; for "T-shirt" the permanent injunction substitutes "clothing or personal items."

The judge had granted summary judgment against the school district on April 29, 2010, after classes had ended but before final exams. By the time he entered the permanent injunction, on May 20, Nuxoll was about to graduate. (Zamecnik was long gone.) All that remained for graduating seniors to do was to participate in a few ceremonial events culminating in the graduation ceremony on May 23. The school argues that injunctive relief was moot on May 20 because Nuxoll had no occasion to wear his "Be Happy, Not Gay" T-shirt at the ceremonial events, and did not. But remember that the injunction had been broadened to permit the display of the slogan on other clothing as well, and so he could by virtue of the injunction have displayed it on his graduation gown had he wanted to.

The school points out that the graduation wasn't held on school grounds and that the injunction doesn't apply to the display of the slogan elsewhere; that's because the school has never asserted a right to control speech off school property. But it would very much like to control it at the graduation ceremony, and so treats the venue of the ceremony as temporary school grounds, as by imposing a dress code on the graduating students and enforcing its school rules against drunkenness and other disruptive behavior—and it regards the display of the slogan "Be Happy, Not Gay" as disruptive.

The claim of mootness evaporates completely when one notes that the permanent injunction runs in favor of any student at the high school, not just Nuxoll; it is not unlikely that one or more of its 4,000-plus students may someday want to display the slogan. Injunctions often run in favor of unnamed members of a group, and this is proper as long as the group is specified. Rule 65(d)(1)(C) of the Federal Rules of Civil Procedure requires that an injunction "describe in reasonable detail . . . the act or acts restrained or required," but the rule does not require that the injunction name the parties who may enforce the injunction. See, e.g., *Wisconsin Action Coalition v. City of Kenosha*, 767 F.2d 1248 (7th Cir. 1985). "When the court believes the underlying right to be highly significant, it may write injunctive relief as broad as the right itself." 1 Dan B. Dobbs, *Law of Remedies* § 2.4(6), p. 113 (2d ed. 1993). And Rule 71 authorizes nonparties to seek enforcement of an injunction that "grants relief for a nonparty or may be enforced against a nonparty."

The school's main argument is that the district judge entered summary judgment prematurely. He did if the school presented enough evidence to warrant an evidentiary hearing to determine whether the school had had a reasonable belief that it faced a threat of substantial disruption. To carry its burden it presented three types of evidence: incidents of harassment of homosexual students; incidents of harassment of plaintiff Zamecnik; and the report of an expert which concluded that the slogan "Be Happy, Not Gay" was "particularly insidious."

The first type of evidence was negligible: a handful of incidents years before the T-shirt was first worn, in a school with thousands of students. The evidence consists, moreover, of just the affidavit and deposition of a single school district official, which merely repeats statements by other, unidentified school officials repeating statements by unidentified students. The deponent described but could not confirm the details of the incidents—and admitted that because the allegations of harassment had not been confirmed, no students had been disciplined.

The second type of evidence was barred by the doctrine, unmentioned by the school, of the "heckler's veto." *Brown v. Louisiana*, 383 U.S. 131, 133 n. 1 (1966); *Tinker v. Des Moines Independent Community School District*, *supra*, 393 U.S. at 508-09; *Terminiello v. City of Chicago*, 337 U.S. 1, 4-5 (1949); *Hedges v. Wauconda Community Unit School Dist. No. 118*, 9 F.3d 1295, 1299-1300 (7th Cir. 1993). Statements that while not fighting words are met by violence or threats or other unprivileged retaliatory conduct by

persons offended by them cannot lawfully be suppressed because of that conduct. Otherwise free speech could be stifled by the speaker's opponents' mounting a riot, even though, because the speech had contained no fighting words, no reasonable person would have been moved to a riotous response. So the fact that homosexual students and their sympathizers harassed Zamecnik because of their disapproval of her message is not a permissible ground for banning it.

Two of the cases that endorse the doctrine of the heckler's veto, *Tinker* and *Hedges*, are school cases, but *Tinker* is also the source of the substantial disruption test of permissible school censorship. See 393 U.S. at 509. A city can protect an unpopular speaker from the violence of an angry audience by deploying police, but that is hardly an apt response to students enraged by a T-shirt. A school has legitimate responsibilities, albeit paternalistic in character, toward the immature captive audience that consists of its students, including the responsibility of protecting them from being seriously distracted from their studies by offensive speech during school hours.

But the anger engendered by Zamecnik's wearing a T-shirt that said "Be Happy, Not Gay" did not give rise to substantial disruption. It was not her wearing the shirt, but her filing this lawsuit, that engendered the creation of a Facebook group entitled "Be Happy! Not Heidi" [Zamecnik's first name] in which hundreds of comments were posted, many hostile to her. But only one was a threat ("someone tells me where she lives, i will fuck up her house, car, and whatever else i can find"), and

it provoked a sensible comment from another student: "you sound [when making threats] just as stupid as she does." Many of the comments addressed substantial issues involving First Amendment claims, school policies, treatment of homosexual students, and the role of the media in the dispute; and apart from the obsessive use of expletives—a defining feature of modern American culture, by no means limited to teenagers—the discussion of the issues was substantive, and even, to a degree, thoughtful. Here are typical comments: "The social studies teachers are going to be having a department meeting right after Spring Break in order to be able to discuss this whole law suit in an educational way, to bring up some really meaningful discussion. More than anything, this case boils down to an issue of constitutional rights. And frankly, school rules override the constitutional rights of minors in the public school system. The school has the right to search and seizure at any time, despite constitutional law. Similarly, 'free speech' doesn't apply in public schools, because school rules are more specific"; "I'm very glad that so many people are banding together against discrimination, just please go about it in a classy and mature way; just like Ana said on the message board, don't stoop to her [Zamecnik's] level"; "Heidi isn't suing because she hates gays, she's suing because she was harassed for being active in what she believes in. I also think that if you were put in her situation, you'd fight tooth and nail to get whatever fucking point it is you are trying to get across. With every good, there is the bad. You have to take it in stride, not make up some stupid community making fun of someone. Heidi

is actually a really nice person who is just misguided by religion and a closed mind."

Zamecnik's parents asked the school to allow a bodyguard to accompany her to class on the 2007 Day of Silence. Her mother said she was worried by the "threats that these particular students had made against Heidi expressing her view." The school did not allow the bodyguard but did have a female staff member escort Zamecnik from class to class on that day. She decided not to wear her "Be Happy, Not Gay" shirt. There were no serious incidents, though it is possible that a water bottle that was thrown and struck one of her friends had been aimed at her.

That leaves for consideration the expert's report. Stephen T. Russell has a Ph.D. in sociology and is a professor of family and consumer sciences at the University of Arizona. His 38-page report, 29 pages of which are devoted to his impressive curriculum vitae, establishes that he's qualified to give expert testimony on matters relating to the attitudes and behavior of teenagers, with special reference to teenagers who belong to minorities, including sexual minorities—including therefore homosexual high-school students. Yet the "analysis and opinions" section of his report, minus its bibliographical references, is less than two and a half pages long and can satisfy none of the requirements for admissible expert testimony that are set forth in Rule 702 of the Federal Rules of Evidence: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has

applied the principles and methods reliably to the facts of the case."

All that the report says, in seven numbered paragraphs, is that: (1) harassment, particularly verbal, of homosexual students is common in schools; (2) schools should therefore have anti-harassment policies; (3) harassed students "are at risk for negative educational and health outcomes"; (4) "homophobic slurs and derogatory remarks" create a risk of "disruptive behavior including student victimization and violence"; (5) school districts can lose state funding "when students miss school because of feeling unsafe due to anti-gay bullying"; (6) the Day of Silence does not "promote homosexual conduct" or "promote the idea that homosexual conduct should be endorsed by society"; (7) "the phrase 'be happy, not gay' is not 'tepid' in a public school setting" and indeed "is particularly insidious because it references a long-standing stereotype that gay people are unhappy, yet appears to be a simple play on words." Points 1 through 6 are plausible inferences from the research that Dr. Russell has either conducted or cites in his report, or so at least we'll assume, though he does not discuss any of that research—just lists citations.

Point 7, however, which is the punchline, comes out of nowhere. There is nothing in the report to indicate that Russell knows anything about Neuqua Valley High School, for there is no reference to the school in the report. No example is given of "particularly insidious" statements about homosexuals. No example is given of a "homophobic slur" or "derogatory remark" about them

that has ever been uttered in any school, or elsewhere for that matter. Though the report calls "be happy, not gay" particularly insidious, it does not indicate what effects it would be likely to have on homosexual students. It gives no indication of what kind of data or study or model Russell uses or other researchers use to base a prediction of harm to homosexual students on particular "negative comments." No methodology is described. No similar research is described.

In the idiom of Rule 702, the expert's report contains no indication of the "facts or data" relied on, no indication that testimony based on the report would be "the product of reliable principles and methods," and no indication that in formulating his opinion the expert "applied the principles and methods reliably to the facts of the case." Dr. Russell is an expert, but fails to indicate, however sketchily, how he used his expertise to generate his conclusion. Mere conclusions, without a "hint of an inferential process," are useless to the court. *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339-40 (7th Cir. 1989); see also *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Clark v. Takata Corp.*, 192 F.3d 750, 758-59 (7th Cir. 1999); *Wittmer v. Peters*, 87 F.3d 916, 920 (7th Cir. 1996); *Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1245 (11th Cir. 2009) (per curiam). Russell's is as thin an expert-witness report as we've seen.

One issue remains: the school challenges the award of damages to the plaintiffs, despite the modesty of the award. The award was justified. Both plaintiffs were injured, though only slightly (but $25 does not exaggerate the harm), by the school's violation of their con-

stitutional rights. Zamecnik's shirt was defaced and Nuxoll's desire to wear the T-shirt on multiple occasions in 2007 was thwarted by fear of punishment.

The district judge was right to grant summary judgment in favor of the plaintiffs, and the relief ordered is justified by the record.

AFFIRMED.