## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-40160

United States Court of Appeals
Fifth Circuit

**FILED**

August 9, 2016

Lyle W. Cayce
Clerk

BRENDA BRINSDON,

       Plaintiff - Appellant

v.

MCALLEN INDEPENDENT SCHOOL DISTRICT; YVETTE CAVAZOS, Individually and in her official capacity as a teacher in the McAllen Independent School District; REYNA SANTOS, Individually and in her official capacity as a teacher in the McAllen Independent School District,

       Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, PRADO, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

When Brenda Brinsdon was a sophomore at a high school in McAllen, Texas, she was required to participate in what defendants claim was a mock performance of the Mexican Pledge of Allegiance as an assignment for her Spanish class. She refused. Brinsdon later filed suit, alleging the defendants violated her constitutional rights. The district court entered summary judgment for the defendants on some of Brinsdon's claims. After a trial on the remaining claims, the district court entered judgment as a matter of law for the defendants. We AFFIRM.

No. 15-40160

## FACTUAL AND PROCEDURAL BACKGROUND

McAllen is a municipality whose limits extend to Texas's border with Mexico.[1]  It has a population of 138,000.[2]  McAllen is also part of the McAllen-Edinburg-Mission Statistical Area, which has the country's second highest percentage of Hispanic people – almost 91% of its population of 775,000.[3]

Monday, September 12, 2011, began the first week of classes at McAllen Achieve Early College High School ("McAllen High" or the "school"), a public school in the McAllen Independent School District (the "District").  At the time, Brenda Brinsdon was a sophomore at McAllen High.  One of the classes Brinsdon took was Spanish III, which was taught by Reyna Santos.  In addition to teaching Brinsdon's class, Santos taught four other Spanish classes.

On that Monday, Santos distributed an assignment to all her classes.  It required students to memorize and recite in Spanish the Mexican Pledge of Allegiance[4] and sing the Mexican National Anthem by that Friday, September 16.  The assignment was a part of a week-long celebration of Mexican Independence Day, which is also on September 16.  According to the class syllabus, the assignment was meant to make students aware of "the culture and heritage of a neighboring country . . . ."  Santos testified that the exercise was meant for cultural awareness and language fluency.  Students were to

---

[1] MAPTECHNICA, https://www.maptechnica.com/us-city-boundary-map/city/McAllen/ state/ TX/cityid/4845384 (last visited Aug. 5, 2016).

[2] TEXAS ALMANAC 2016-2017, at 436 (2016).

[3] STEVEN G. WILSON, ET AL., U.S. CENSUS BUREAU, PATTERNS OF METROPOLITAN AND MICROPOLITAN POPULATION CHANGE: 2000 TO 2010, at 50 (2012), www.census.gov/prod/cen2010/reports/c2010sr-01.pdf.

[4] The English translation of the pledge is this: "Mexican Flag, legacy from our heroes, symbol of the unity of our ancestors and our brothers, we promise you to always be loyal to the principles of freedom and justice that make this an independent, human and generous nation to which we dedicate our existence."

mimic the pledge ceremony that Mexican citizens follow: saying the words while standing with their right arm raised at a 45-degree angle.

Brinsdon's brief states she is proud to be of mixed American and Mexican heritage, as her mother was born in Mexico and her father in the United States. Brinsdon still objected to the assignment, believing "pledging her allegiance to a different country was wrong . . . ." She did not complain about having to sing the Mexican National Anthem. She informed Santos she would not recite the pledge. Additionally, Brinsdon wanted the entire class to be exempt from the assignment. Santos replied that the assignment was graded and mandatory. Brinsdon left class to see Principal Yvette Cavazos. What happened during and immediately after Brinsdon's meeting with Cavazos is in dispute.

Brinsdon testified that Cavazos failed to address her concerns, instead justifying the assignment simply as "a cultural thing." Brinsdon then claims she returned to the classroom and saw that her class was practicing the pledge. She stated that she felt peer pressure, knew the eventual assignment was graded, and decided to practice reciting the pledge. After class, Brinsdon again met with Cavazos, this time with Santos present. The three agreed to an arrangement where Brinsdon would submit a writing assignment to Santos in lieu of reciting the pledge. Cavazos, on the other hand, testified she accompanied Brinsdon from her office to Santos's class and met with Santos at that time to discuss an alternative assignment.

It is undisputed, however, that Brinsdon was given an alternative assignment on which she received a "C." Most of the other students received an "A." It is unclear whether the grade Brinsdon received was due to her lack of effort, as Santos asserted, retaliation for having complained about reciting the pledge, as Brinsdon suspected, or another reason.

After the end of school on Monday, Brenda Brinsdon informed her father, William Brinsdon, of these events. At her father's insistence, Brenda brought

her father's "spy pen"[5] to class later that week with the goal of surreptitiously recording her classmates reciting the Mexican Pledge. Brenda did not have permission to record the class. Neither Santos nor Brenda's classmates knew they were being recorded. Also that week, on Thursday, September 15, 2011, William Brinsdon met with Principal Cavazos. The meeting did not alleviate his concerns. Other school authorities allegedly were unresponsive. As a result, William Brinsdon contacted a number of media outlets, resulting in an interview with national radio host Glenn Beck on October 17, 2011. On the same day as the interview, the spy pen recording was published on Beck's news website, *The Blaze*. The next day, *Fox News* interviewed Brenda Brinsdon. The stories received national publicity.

After this media attention, McAllen High officials say the school was inundated with calls, letters, and emails. A substantial number of these communications were derogatory toward people of Mexican and Hispanic descent. Some threatened harm to individuals at the school. On October 19, 2011, the day after *Fox News* interviewed Brenda Brinsdon, two days after William Brinsdon's interview with Glenn Beck and *The Blaze*'s publication of the recording, and over a month after Brenda was allegedly compelled to recite the Mexican Pledge, Brenda was removed from class. Brenda completed Spanish III by self-studying in Cavazos's office. She graduated from McAllen High in 2014.

Brenda Brinsdon, through her father, filed suit on February 27, 2013. She sought an injunction, a declaratory judgment, and nominal damages against Santos, Cavazos, and the District. Brinsdon asserted her claims under 42 U.S.C. § 1983. Brinsdon's first claim was that her First Amendment rights were violated when she was compelled to recite the pledge and that she was

---

[5] A spy pen is a small camera and audio recorder disguised to look like a regular pen.

retaliated against when she was removed from class.  Brinsdon's second claim was based on the Equal Protection Clause, arguing that she suffered disparate treatment when she was removed from class.  Cavazos and Santos, the two individual defendants, asserted qualified immunity as a defense.

All parties filed motions for summary judgment.  The district court denied Brinsdon's motion in full.  It entered summary judgment in part for the individual defendants, upholding their qualified immunity defense.  The court also granted summary judgment for the District for removing Brinsdon from class.  The compelled speech and equal protection claim against the District proceeded to trial.  The district court entered judgment as a matter of law in favor of the District concluding Brinsdon had not established a municipal policy.  Brinsdon timely appealed.

DISCUSSION

Among Brinsdon's claims of error is that the district court should have granted her motion for summary judgment on the equal protection and compelled speech claim.   Denials of summary judgment, with few exceptions not relevant here, are not final decisions that can be reviewed.  *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc).  Hence, Brinsdon cannot appeal this aspect of the district court's order.

We review only these issues and rulings:

I.  Possible mootness of the case due to Brinsdon's graduation;

II. The entry of judgment as a matter of law on the issue of the District's municipal liability, after Brinsdon had presented her case at trial;

III. The entry of summary judgment in favor of Cavazos and Santos on qualified immunity;

IV. The entry of summary judgment for all defendants on the claim she was improperly removed from class. We consider the validity of this ruling as

to the District when discussing municipal liability, and as to the individual defendants under the last issue.

I.    *Mootness*

A claim is moot when a case or controversy no longer exists between the parties. *Board of Sch. Comm'rs v. Jacobs*, 420 U.S. 128, 129 (1975). "Mootness is a jurisdictional matter which can be raised for the first time on appeal." *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 204 (5th Cir. 2010). The mootness doctrine applies to equitable relief but will not bar any claim for damages, including nominal damages. *See Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 748 & n.32 (5th Cir. 2009) (collecting cases).

Brinsdon has graduated from McAllen High. This fact moots her equitable claims. *See, e.g.*, *Sapp v. Renfroe*, 511 F.2d 172, 175 (5th Cir. 1975). Additionally, Brinsdon does not qualify for the "capable of repetition yet, evading review" exception because there is no "reasonable expectation that [she] . . . would be subject[] to the same action again." *Lopez v. City of Houston*, 617 F.3d 336, 340 (5th Cir. 2010).

Brinsdon relies on two cases to save her equitable claims. In one, the Seventh Circuit held that a permanent injunction in favor of all students in a high school meant that graduated students' claims against the school were not moot. *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874 (7th Cir. 2011). The case is readily distinguishable. The district court there entered the permanent injunction before one of the named students had graduated. *Id.* at 878. The injunction also expanded the class of plaintiffs to every student at the school. *Id.* at 878–79. These facts kept the case and controversy alive between the plaintiffs-students and the defendant-school district. No such injunction exists as to McAllen High.

In the other case, the Supreme Court decided a student speech case

No. 15-40160

seemingly long after the student, Frederick, had graduated. *Morse v. Frederick*, 551 U.S. 393 (2007). Frederick sought equitable relief and damages. The Court, though, "granted certiorari on two questions: whether Frederick had a First Amendment right to wield his banner, and, if so, whether that right was so clearly established that the principal may be held liable for damages." *Id.* at 400. The Court had narrowed the relief sought only to damages, which, as we explained above, is not barred by the mootness doctrine.

Because Brinsdon has graduated from high school, her only surviving claim is for nominal damages arising from the alleged violation of her rights.

## II.    *Municipal Liability*

Brinsdon appeals the district court's entry of judgment as a matter of law in favor of the District on the ground that there was no municipal liability. The motion was made and granted after Brinsdon had presented her case at trial. A judgment as a matter of law is reviewed *de novo*. *Resolution Tr. Corp. v. Cramer*, 6 F.3d 1102, 1109 (5th Cir. 1993). We must view the evidence "in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Id.*

"[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Additionally, "[t]he policymaker must have either actual or constructive knowledge of the alleged policy" to be held liable. *Cox v. City of Dallas*, 430 F.3d 734, 748−49 (5th Cir. 2005).

Regarding knowledge, the Texas Essential Knowledge and Skills ("TEKS") guidelines give schools parameters and objectives for their lesson plans, but teachers have the flexibility to elect the form or the activities that they use to address those objectives. *See* 19 TEX. ADMIN. CODE ANN. §§ 128.10–

.32. Brinsdon argues that Cavazos's authority under the TEKS guidelines to "oversee the curriculum and approve lesson plans" was a delegation of policymaking authority from the District. Therefore, because Cavazos had actual knowledge of the assignment, Cavazos's knowledge can be imputed to the District. Even so, an instructor's "discretion" to review and approve lesson plans is not a delegation. *See Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 216–17 (5th Cir. 1998). Hence, because there was no delegation of policymaking authority to Cavazos, her knowledge of the pledge assignment cannot be imputed to the District.

Brinsdon also makes a constructive-knowledge argument, noting the assignment has been in existence at least since Cavazos's own children performed the assignment when they attended high schools in the District 15 years ago. This evidence, though, at most shows that Cavazos knew the assignment had been given over a decade earlier. The evidence does not establish the assignment's continuity even by the teacher(s) who gave it to Cavazos's children, much less that it was a District policy of any kind that would have affected some or all teachers and schools. While "prolonged public discussion or . . . a high degree of publicity" would support a finding of constructive knowledge, such facts do not exist here. *Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002).

Even if we were to accept that the possible longevity of the assignment meant some policymakers in the District were aware of the assignment, this does not prove there was a policy forcing the recitation of the Mexican Pledge. The District's alleged knowledge of, and failure to object to, the giving of the assignment is not the same as the District requiring recitation of the Pledge. Again, municipal liability requires "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski*, 237 F.3d at 578. Because there is no official policy, there can be no

liability.  Though policy may be shown by custom, custom requires "persistent, often repeated, [and] constant violations . . . ."  *Id.* at 581.  No constant violations have been shown.  Partly, that is the result of there being no evidence of anyone previously complaining about the assignment.  Such prior complaints potentially would have created evidence of the knowledge of policymakers and whether they insisted upon the recitation of the pledge.

Brinsdon has failed to demonstrate the existence of an official policy or that the District had knowledge of the assignment.  Judgment as a matter of law was proper for the District on municipal liability for any constitutional violation that may have arisen from the assignment or subsequent actions.  Thus, our ruling also applies to the claims against the district of retaliation and for violation of Equal Protection.

### III.   *Qualified Immunity*

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal."  *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc).  To establish that qualified immunity does not apply, Brinsdon must prove that Santos or Cavazos (1) "violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Id.* at 371.  A "plaintiff has the burden to negate the assertion of qualified immunity once properly raised."  *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009).  We may begin by analyzing either step of the qualified immunity inquiry.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Brinsdon raises three separate claims against Santos and Cavazos.  First, her First Amendment right to be free from compelled speech was violated.  Second, she suffered retaliation based on her First Amendment protected speech when she was removed from her class.  Third, she was treated

unequally in violation of the Equal Protection Clause.

On the compelled speech claim, the district court granted summary judgment to Santos and Cavazos under step two of the qualified immunity inquiry, that is, no clearly established right was violated. As to retaliation, the district court granted summary judgment to Santos and Cavazos because the only evidence was that Brinsdon was removed not due to her exercise of First Amendment rights but because her actions disrupted class. Finally, we find no definite ruling on the equal protection claim. Brinsdon's complaint asserts that "the Defendants," which means both the individuals and the District, were guilty of violating her equal protection rights. The district court rejected summary judgment as to that claim, without differentiating among the defendants. In granting summary judgment on qualified immunity, the court's analysis relied on the lack of clearly established law on the compelled speech claim, but no similar ruling was made as to retaliation or equal protection. At trial, a directed verdict was granted dismissing municipal liability on all claims (including equal protection). That analysis, though, would not apply to the individuals' liability. The parties do not explain in their briefing how the claim against the individuals was resolved. We find enough in the record to resolve it, though, as we discuss.

We review a grant of summary judgment *de novo*. *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 386 (5th Cir. 2007). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The most straightforward way to resolve all three claims against Santos and Cavazos is in the manner the district court did for the compelled speech claim: no clearly established law would have shown these defendants that they were violating Brinsdon's rights. We now apply that analysis.

No. 15-40160

*A. Compelled Speech*

The "right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Indeed, the right to speak and the right not to speak are "complementary components of the broader concept of 'individual freedom of mind'"; any "difference [between them] is without constitutional significance . . . ." *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988). Brinsdon argues that Santos, an instrument of the state, unconstitutionally compelled Brinsdon to speak against her will.

The most analogous precedent to this case, superficially at least, is a 1943 Supreme Court decision that struck down a state statute requiring every schoolchild to salute the American flag and recite the Pledge of Allegiance to the United States. *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The *Barnette* requirement of a Pledge began with a 1941 West Virginia statute that required each school to conduct courses in history, civics, and the Constitution "for the purpose of teaching, fostering, and perpetuating the ideals, principles and spirit of Americanism . . . ." *Id.* at 625. In early 1942, only a month after the attack on Pearl Harbor and the start of the American involvement in World War II, the West Virginia State Board of Education implemented the statute in part by requiring all teachers and pupils to make a daily Pledge of Allegiance to the United States. *Id.* at 626. Clearly, West Virginia sought to have students each day make an *operative* pledge of allegiance, that is, a statement of actual belief.

The three-judge district court, through Fourth Circuit Judge John J. Parker, wrote dramatically of the reason the mandatory pledge had to fall:

> The salute to the flag is an expression of the homage of the soul.
> To force it upon one who has conscientious scruples against giving

11

it, is petty tyranny unworthy of the spirit of this Republic and forbidden, we think, by the fundamental law.

*Barnette v. W. Va. State Bd. of Educ.*, 47 F. Supp. 251, 255 (S.D. W. Va. 1942).[6] The Supreme Court affirmed. It held that the state unacceptably sought to compel "a belief and an attitude mind." *Barnette*, 319 U.S. at 633. The Pledge in *Barnette* was not just a tool to shape learning but also a tool to compel patriotism, and that this latter goal was unacceptable. Indeed, the West Virginia statute had penalties for noncompliance: expulsion from school, fines, and even jail. *Id.* at 629. Further, the Court noted that objections to being required orally and in writing to accept an idea were "well known to the framers of the Bill of Rights," and it attempted to assuage fears that "patriotism will not flourish if patriotic ceremonies are voluntary and spontaneous instead of a compulsory routine . . . ." *Id.* at 633, 641.

In a later case, the Court struck down a New Hampshire law that required all vehicle license plates to display the motto "Live Free or Die." *See Wooley*, 430 U.S. 705. The Court stated that "as in *Barnette*, we are faced with a state measure which forces an individual . . . to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Id.* at 715. Thus, what the Court found objectionable in both *Barnette* and *Wooley* was the state's purpose of "fostering public adherence to an ideological point of view . . . ." *Id.*

The difference with the McAllen High pledge assignment, the defendants insist, is that Santos was not seeking to inculcate beliefs by requiring the recital of the Mexican pledge. If there were such evidence in this case, even though the country to which loyalty was being pledged is different, we would

---

[6] Judge Parker was almost on the Supreme Court by the time of *Barnette*, as he was nominated in 1930 for the Court but failed confirmation by a 41-39 Senate vote. J. MYRON JACOBSTEIN & ROY M. MERSKY, THE REJECTED 111–22 (1993).

No. 15-40160

reach the same result as the Supreme Court did in *Barnette* and *Wooley*. There is, though, no evidence in this case of a purpose to foster Mexican nationalism. Instead, the only evidence is that students were, as part of a cultural and educational exercise, to recite a pledge of loyalty to a foreign flag and country. Santos testified and the class syllabus states that the pledge was educational, and the punishment for noncompliance was a failing grade. Finally, the assignment was a singular event; it was not repeated on a daily basis. In summary, the compelled speech at issue is a pledge that did not seek to compel the speaker's affirmative belief.

We have already indicated that we will resolve these issues on the basis that no law at the time of the events clearly established that Brinsdon had a constitutional right that the defendants were violating. Brinsdon insists on the contrary that these facts were clearly established over seven decades ago in *Barnette*. We cannot agree.

Our specific question is whether a student who objects to an "ideologically neutral" pledge, that is a pledge of simulated beliefs, has a constitutional right to refuse to so pledge. The fact that the pledge did not involve a compulsion of belief does not strip this assignment from heightened concerns. Requiring a student to pledge allegiance is serious business. A pledge, whether of allegiance to a country or to tell the truth in a court of law, can express an intention to carry forth a course of action that may impact matters of public concern. Yet, whatever the proper analysis of compelled recitation of simulated pledges may be, no caselaw holds that such analysis is the same as *Barnette*. Indeed, no caselaw has directly addressed this situation.

First, *Barnette* referenced, but did not analyze, the idea of making a pledge without actually believing in the words uttered. The Court interpreted the Board of Education regulation as being premised on an

> affirmation of a belief and an attitude of mind. It is not clear

> whether the regulation contemplates that pupils forego any contrary convictions of their own and become unwilling converts . . . or whether it will be acceptable if they simulate assent by words without belief and by a gesture barren of meaning.

*Barnette*, 319 U.S. at 633. Despite that language, the Court was clear that it was invalidating the requirement because the State cannot "force citizens to confess by word or act their faith" in the same orthodoxy of "politics, nationalism, religion, or other matters of opinion . . . ." *Id.* at 642. There is no evidence that the Pledge in Spanish class was seeking to force orthodoxy.

Second, other circuits have confronted situations dealing with compelled student speech, though none are directly applicable to this case. One court noted it proper to "deny students the ability to express themselves by adopting the words of others," i.e., commit plagiarism. *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1302 (7th Cir. 1993). Another court discussed that a teacher may, without fear of personal liability, "assign students to write 'opinions' showing how Justices Ginsburg and Scalia would analyze a particular Fourth Amendment question." *Brown v. Li*, 308 F.3d 939, 953 (9th Cir. 2002). Finally, the Tenth Circuit held that a university does not offend the First Amendment when it compels, for legitimate pedagogical reasons, a student to recite lines of a play even if the student believes the recital would be contrary to her religious convictions. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1291–92 (10th Cir. 2004). In sum, it is clearly established that a school may compel some speech. Otherwise, a student who refuses to respond in class or do homework would not suffer any consequences. Students, moreover, generally do not have a right to reject curricular choices as these decisions are left to the sound discretion of instructors.

Third, it is well understood that "[s]peech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and

social changes desired by the people.'" *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).  Thus, even a non-operative pledge may affect the public and political discourse.  Nonetheless, First Amendment protections have traditionally been for "matters of adult public discourse," and it is not true that "the same latitude must be permitted to children in a public school." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986).  The First Amendment rights of students "are not automatically coextensive with the rights of adults in other settings." *Id.* Students do not completely "shed their constitutional rights to freedom of speech . . . at the schoolhouse gate," but the First Amendment must be "applied in light of the special characteristics of the school environment . . . ." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

As true of us all, teachers and administrators can exercise their discretion poorly.  Even so, we have shown that student disagreement with a teacher's curricular choices does not generally rise to the level of a First Amendment violation, and there is no clearly established law about the compelled speech of a pledge of simulated beliefs.  Santos as teacher, and Cavazos as principal, were not ignoring clearly established contrary law when compelling the assignment of the Mexican pledge.  Qualified immunity on compelled speech was properly granted.

### B. Removing Brinsdon from Class

Brinsdon claims that Santos and Cavazos retaliated against her when they removed her from class on the basis of her protected speech.  This circuit does not have a specialized test for considering retaliation by schools for students' exercise of the right to free speech.  Instead, the framework established in *Tinker* largely applies to every question regarding "when and whether the First Amendment requires a school to *tolerate* particular student

speech . . . ." *Swanson*, 659 F.3d at 375 (quotation marks omitted).

Here, there were two speech events that Brinsdon identifies as possibly triggering her removal. The first is her objection to the assignment to recite the pledge, which we have already addressed as not violating clearly established law. Brinsdon's claim also includes, though, a later event: Brinsdon and her father spoke to media off-campus roughly a month after the giving of the pledge assignment. Defendants allege this off-campus speech caused problems within the school. To avoid the application of qualified immunity, Brinsdon would need to show that the law was clearly established that a constitutional right existed, and that the actions taken by the individual defendants violated the right. Specifically, Brinsdon complains about being removed from class over a month after she expressed her objection to the Pledge assignment.

As to whether she was removed due to her original opposition to the pledge, there is no evidence to support the claim. Brinsdon relies solely on Cavazos's deposition statement that "[i]f [Brenda] didn't feel comfortable with the Mexican pledge, then it was my opinion that she didn't need to be in the classroom." Cavazos's full answer conveys a different message:

> A: [Brinsdon] was very adamant about other students not doing the activity, and [Brinsdon] will argue and – I had her as a ninth grader. The other students were going to continue with the activity, and if I didn't stop it, she – she wanted me to stop everyone from doing that activity, and if she didn't feel comfortable with the Mexican pledge, then it was my opinion that she didn't need to be in the classroom, as the students were engaged in -- in their activities.
>
> Q: And was this – you were thinking that that was a possible outcome, that [Brinsdon] would be an interruption?
>
> A: Based on my history with [her,] yes, that was a possible outcome.

No. 15-40160

Cavazos is stating that Brinsdon was removed because of her intent to stop her classmates from reciting the pledge. Indeed, Cavazos, in her answer to another question in the same deposition, says

> it wasn't so much her personal belief, because everyone has a right to their personal belief, and I totally respect that. She . . . didn't want anybody else to partake in specific school activities that were not in line with her . . . or her dad's beliefs.

In addition, the temporal remoteness between Brinsdon's speech and her removal suggests that she was not removed because of her opposition to the Pledge. For essentially the same reasons as those discussed in relation to the compelled speech claim, qualified immunity would apply to the claim that Cavazos and Santos punished her for objecting to saying the Pledge.

As to the later speech event, we note that Brinsdon's removal occurred almost immediately after her father, William Brinsdon, was interviewed by Glenn Beck, *The Blaze* published the spy pen video, and Brenda Brinsdon went on *Fox News*. We apply, as the parties both concede we should, the analysis set out in *Tinker* because the speech in question was not school-sponsored, and in no way carried the school imprimatur. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270–71 (1988). *Tinker* analyzed the right of students to wear armbands in protest of the Vietnam War. 393 U.S. at 504. The Court held that expressive conduct may be suppressed if it "materially and substantially interfere[s]" with school activities. *Id.* at 509. Mere "discomfort and unpleasantness that always accompany an unpopular viewpoint" is not enough. *Id.* On the other hand, if there are "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities," the school may act on those. *Id.* at 514.

The defendants rely on these parts of *Tinker*, which we just summarized. Brinsdon makes two arguments that the circumstances of this case did not warrant her removal under *Tinker*. Brinsdon first argues that third parties,

not she, caused any disruptions.  Without a doubt, though, Brinsdon's actions at least prompted the hundreds of communications, some threatening, that McAllen High received after the recording was published.  Brinsdon also argues that any interference she caused was insubstantial.  The record shows McAllen High received hundreds of communications from anonymous people, some of which contained threats of harm.  Indeed, Cavazos testified that after Brinsdon's "Fox channel videotaping, I explained to her that . . . the situation had created a hostile environment for the school and for the teacher . . . and the teacher and myself were receiving hate mails and calls and feared for our safety . . . [and] that the student[s] she videotaped felt betrayed . . . ."

We accept that there are legitimate concerns, even constitutional ones, related to school efforts to interfere with students' talking to the press about controversial topics.  In addition, it might be disputed whether the level of disruption that was caused or forecasted here was enough to justify Brinsdon's removal from class.  We are not, though, deciding the ultimate constitutional issues here.  Instead, we are reviewing this claim for whether Santos and Cavazos were entitled to qualified immunity.

We begin by again pointing out that the parties conceded that *Tinker* applies to the claims presented by Brinsdon.[7]  In the seven pages Brinsdon devotes to the grant of qualified immunity for removing her from class, the only Supreme Court authority cited that analyzes the First Amendment in the school setting is *Tinker*.  More general speech cases are cited for generic principles.  Those are not helpful here, because due to "the special features of the school environment, school officials must have greater authority to

---

[7] In *Bell v. Itawamba County School Board*, 799 F.3d 379 (5th Cir. 2015) (en banc), we stated that whether *Tinker* applies is "heavily influenced by the facts in each matter," and we declined "to adopt any rigid standard . . . ." *Id.* at 396.  We looked to various factors in determining whether *Tinker* applies.  In light of the fact that both parties agree *Tinker* applies, we will not go through the *Bell* analysis.

intervene before speech leads to violence," or, we would add, to serious disruptions. *Morse*, 551 U.S. at 425 (Alito, J., concurring). Opinions from other circuits are also cited in the brief, but such caselaw does not firmly establish the law applicable to Santos and Cavazos in our jurisdiction.

Brinsdon has cited no clearly established law that the disruptions at McAllen High that had already occurred or which could be anticipated were insufficient to justify removing her from class. The student speech was published to the national audience that *Fox News* and *The Blaze* command. Santos was identified by name and her face was shown in the video. Even if the resulting disruptions were in fact insubstantial, a "fact" we do not find, Brinsdon's publication of her complaints to a national audience were demonstrable factors leading to the school's reasonable forecast of sufficient disruption. Indeed, the threats eventually caused police to maintain a patrol of the school. Santos was escorted to and from her car every day. She was forced to take time off from work.

Qualified immunity was properly granted to Santos and Cavazos on the claim they violated her First Amendment rights when they removed Brinsdon from class.

## C. *Equal Protection*

Brinsdon explains her final claim this way: "Defendants' policies call for disparate treatment . . . where individuals who do not object to pledging their loyalty to Mexico are allowed to stay in the classroom, while those who do object must be removed."

As discussed already, the evidence is that Brinsdon was removed for the disruption she caused and not for her objection to the assignment. We have also held that Brinsdon was not exercising a clearly established First Amendment right when she initially refused to recite the Mexican pledge.

Thus, even if she had been removed due to her objections to the pledge, qualified immunity would apply.

Given that Brinsdon's equal protection argument mirrors her First Amendment retaliation argument, it is unnecessary to analyze this claim "because the substantive guarantees of the [First] Amendment serve as the strongest protection against the limitation of these rights . . . . [If the defendants' actions] survive substantive review under the specific guarantees [of the First Amendment,] they are also likely to be upheld under an equal protection analysis . . . ." *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 226 n.9 (5th Cir. 2009).

AFFIRMED.